In the Matter of **AUTOMATED BOOK-BINDING SERVICES, INC.,**
**Bankrupt.**

**FINANCE COMPANY OF AMERICA,**
**Appellant,**

v.

**HANS MUELLER CORPORATION,**
**Appellee.**

**No. 72–1331.**

United States Court of Appeals,
Fourth Circuit.

Argued Sept. 13, 1972.

Decided Dec. 27, 1972.

Alfred H. Moses, Washington, D. C. (David N. Brown and Covington & Burling, Washington, D. C., Louis J. Sagner, and Sagner, Stevan & Harris, Baltimore, Md., on brief), for appellant.

Charles G. Page, Baltimore, Md. (Clarke Murphy, Jr., and White, Page & Lentz, Baltimore, Md., on brief), for appellee.

Before SOBELOFF, Senior Circuit Judge, and WINTER and BUTZNER, Circuit Judges.

SOBELOFF, Senior Circuit Judge:

Finance Company of America (FCA) and Hans Mueller Corporation (HMC) had conflicting security interests in a bookbinding machine sold by HMC to Automated Bookbinding Services, Inc., a

Maryland corporation who later became bankrupt. This litigation was instituted to determine which secured party had priority in the binder after the debtor's bankruptcy, and is to be decided under Article 9 of the Uniform Commercial Code and Article 95B of the Ann.Code of Md. (1957 as amended), § 9–101 et seq.

The referee in bankruptcy ruled in favor of FCA's claim. On a petition for review of the referee's order, the District Court awarded the right to possession of the binder to HMC. For the reasons set forth in this opinion we reverse and reinstate the referee's original order.

## I

## FACTS

The technical intricacies of the Uniform Commercial Code necessitate a rather particularized recital of the facts that gave birth to the present controversy. This is required for a proper perspective of the issues.

On November 20, 1968, Automated Bookbinding Services, Inc., for brevity hereafter called the bankrupt, executed an installment note payable to the order of FCA in the amount of $151,267.75. A chattel mortgage security agreement was entered into to secure the obligation, which covered all the bankrupt's equipment that was listed in the agreement. FCA properly filed a financing statement on November 21, 1968, in Anne Arundel County, Maryland, which covered the bankrupt's after-acquired property as well as its present equipment, § 9–204(3),[1] thereby perfecting its security interest in the collateral, §§ 9–302(1), 9–303(1).[2]

1. This section permits security interests to attach to after-acquired property. The section reads in pertinent part:

    (3) Except as provided in subsection (4) a security agreement may provide that collateral, whenever acquired, shall secure all obligations covered by the security agreement.

2. The sections read in pertinent part:
    § 9–302. When filing is required to perfect security interest; security interests

to which filing provisions of this subtitle do not apply.

    (1) A financing statement must be filed to perfect all security interests except the following:

    (a) A security interest in collateral in possession of the secured party under § 9–305;

    (b) A security interest temporarily perfected in instruments or documents without delivery under § 9–304 or in

The bankrupt contracted with HMC on January 30, 1970, to purchase a new bookbinder. A valid security agreement was entered into and HMC retained a valid purchase money security interest in the machine, § 9–107(a).[3]

The cash price under the contract was $84,265 with an installation charge of $2,160, making a total price of $86,425. Additional terms of the contract provided for a cash down payment at the time of the order of $6,442.50, cash before delivery of $6,442.50, and a trade-in allowance on an old binder of $22,000. This left a balance of $51,540, which was secured by HMC's purchase money security interest.

Fifteen cases of component parts for the binder were sent from Europe, under a negotiable bill of lading, to the order of Rohner, Gehrig & Co., HMC's shipping agents. The shipment arrived in New York on May 18, 1970. On May 22, 1970, after receiving the bankrupt's second payment of $6,442.50, HMC mailed an invoice to the bankrupt identifying the binder's parts by particular description and serial numbers and providing for payment of the balance of $51,562.50 in cash upon completion of the installation.

The shipper, Rohner, Gehrig & Co., upon HMC's instructions, directed Hemingway Transport, Inc., a common carrier, to pick up the 15 crates from dockside in New York and to deliver them, together with two additional crates of component parts, to the bankrupt in Maryland. All these crates arrived at bankrupt's plant in Maryland on several dates between May 26, 1970, and June 2, 1970.

Pursuant to its January 30 agreement with the bankrupt, HMC sent two employees to the bankrupt's plant to install the binder. The installation began on May 27, 1970. It is not clear from the record when installation was completed, but it was finished not earlier than June 13 nor later than June 19. The bankrupt acknowledged delivery and satisfactory completion of installation on June 18.

HMC filed a financing statement in Anne Arundel County, Maryland, to perfect its purchase money security interest in the binder on June 15. The bankruptcy filing occurred on February 24, 1971.

## II

### OPINIONS BELOW

This case presents the single issue of which of the two secured creditors, FCA or the purchase money security interest

---

proceeds for a ten day period under § 9–306;

(c) A purchase money security interest in farm equipment having a purchase price not in excess of $500; but filing is required for a fixture under § 9–313 or for a motor vehicle required to be licensed;

(d) A purchase money security interest in consumer goods having a purchase price not in excess of $500; but filing is required for a fixture under § 9–313 or for a motor vehicle required to be licensed;

(e) An assignment of accounts or contract rights which does not alone or in conjunction with other assignments to the same assignee transfer a significant part of the outstanding accounts or contract rights of the assignor;

(f) A security interest of a collecting bank (§ 4–208) or arising under the subtitle on sales (see § 9–113) or covered in subsection (3) of this section.

§ 9–303. When security interest is perfected; continuity of perfection.

(1) A security interest is perfected when it has attached and when all of the applicable steps required for perfection have been taken. Such steps are specified in §§ 9–302, 9–304, 9–305 and 9–306. If such steps are taken before the security interest attaches, it is perfected at the time when it attaches.

3. § 9–107. Definitions: "Purchase money security interest."

A security interest is a "purchase money security interest" to the extent that it is

(a) Taken or retained by the seller of the collateral to secure all or part of its price; or

(b) Taken by a person who by making advances or incurring an obligation gives value to enable the debtor to acquire rights in or the use of collateral if such value is in fact so used.

holder HMC, is entitled to the binder. Under § 9–312(4),[4] purchase money security interest holders are generally given priority in cases such as this. The referee held that the bankrupt received possession of the binder on June 2, when the last crates were delivered, and since HMC's June 15 filing came more than 10 days after the debtor received possession, HMC lost its § 9–312(4) priority. The volume of adjudication in this special area is scanty. Disposition of the case therefore requires a close analysis of the Code and its provisions.

The District Court ruled in favor of HMC's claim on two alternative grounds. First, the court held that the debtor did not receive possession on June 2, when the delivery was completed, but rather some time between June 13 and 19, when HMC completed its installation. Possession did not occur, according to the District Court, until the tender of delivery terms the bankrupt bargained for with HMC were completed (§§ 2–503, 507).[5] The District Court's reasoning continued that, since installation was a tender of delivery term and occurred June 13, at the earliest, HMC's June 15 filing perfected its purchase money security interest within 10 days after the debtor received possession of the collateral. Therefore, the District Court concluded, HMC's purchase money security interest retained its § 9–312(4) priority.

In its alternative holding the District Court ruled in favor of HMC's claim based upon the third sentence of § 9–

---

4. (4) A purchase money security interest in collateral other than inventory has priority over a conflicting security interest in the same collateral if the purchase money security interest is perfected at the time the debtor receives possession of the collateral or within ten days thereafter.

5. The sections read in pertinent parts:
§ 2–503. Manner of seller's tender of delivery.
(1) Tender of delivery requires that the seller put and hold conforming goods at the buyer's disposition and give the buyer any notification reasonably necessary to enable him to take delivery. The manner, time and place for tender are determined by the agreement and this subtitle, and in particular
(a) Tender must be at a reasonable hour, and if it is of goods they must be kept available for the period reasonably necessary to enable the buyer to take possession; but
(b) Unless otherwise agreed the buyer must furnish facilities reasonably suited to the receipt of the goods.
(2) Where the case is within the next section respecting shipment tender requires that the seller comply with its provisions.
(3) Where the seller is required to deliver at a particular destination tender requires that he comply with subsection (1) and also in any appropriate case tender documents as described in subsections (4) and (5) of this section.
(4) Where goods are in the possession of a bailee and are to be delivered without being moved.
(a) Tender requires that the seller either tender a negotiable document of title covering such goods or procure acknowledgment by the bailee of the buyer's right to possession of the goods; but
(b) Tender to the buyer of a non-negotiable document of title or of a written direction to the bailee to deliver is sufficient tender unless the buyer seasonably objects, and receipt by the bailee of notification of the buyer's rights fixes those rights as against the bailee and all third persons; but risk of loss of the goods and of any failure by the bailee to honor the non-negotiable document of title or to obey the direction remains on the seller until the buyer has had a reasonable time to present the document or to obey the direction defeats the tender.
§ 2–507. Effect of seller's tender; delivery on condition.
(1) Tender of delivery is a condition to the buyer's duty to accept the goods and, unless otherwise agreed, to his duty to pay for them. Tender entitles the seller to acceptance of the goods and to payment according to the contract.
(2) Where payment is due and demanded on the delivery to the buyer of goods or documents of title, his right as against the seller to retain or dispose of them is conditional upon his making the payment due.

103(3).[6] The court was of the view that HMC had perfected its security interest while the goods were still in New York, not through filing but through taking possession of the crates, §§ 9–303(1),[7] 305.[8] Under § 9–103(3) HMC's already perfected security interest continued perfected in Maryland until September, 1970, and the June 15 filing was well within the allotted time for filing.

We think the District Court erred in both alternative holdings. The bankrupt received possession on June 2, when the crates arrived, and completion of tender of delivery terms is irrelevant to when possession occurs under the Code.

Additionally, the comity provisions of § 9–103(3) were not intended to allow a perfection in one state to continue in another when the parties knew and agreed to transfer the collateral to the second state within 30 days.

## III

### POSSESSION UNDER ARTICLE 9

HMC's claim of priority under § 9–312(4), as a purchase money security interest holder, depends on how the word "possession," used in that section, is to be defined. Because assuming HMC's interest was not perfected when the bankrupt received possession, perfection would have to occur within 10 days after the bankrupt obtained possession in order for HMC's interest to take priority.

We reject the District Court's holding that possession was received by the bankrupt when the tender of delivery terms of HMC and the bankrupt were completed, between June 13 and 19. Such an approach confuses the Article 2 tender of delivery concept with the Article 9 notion of possession.

■ "Possession" is one of the few terms employed by the Code for which it

---

**6.** (3) If personal property other than that governed by subsections (1) and (2) is already subject to a security interest when it is brought into this State, the validity of the security interest in this State is to be determined by the law (including the conflict of laws rules) of the jurisdiction where the property was when the security interest attached. However, if the parties to the transaction understood at the time that the security interest attached that the property would be kept in this State and it was brought into this State within thirty days after the security interest attached for purposes other than transportation through this State, then the validity of the security interest in this State is to be determined by the law of this State. *If the security interest was already perfected under the law of the jurisdiction where the property was when the security interest attached and before being brought into this State, the security interest continues perfected in this State for four months and also thereafter if within the four months period it is perfected in this State.* The security interest may also be perfected in this State after the expiration of the four month period; in such case perfection dates from the time of perfection in this

State. If the security interest was not perfected under the law of the jurisdiction where the property was when the security interest attached and before being brought into this State, it may be perfected in this State; in such case perfection dates from the time of perfection in this State. (Italics added.)

**7.** *Supra,* n. 2.

**8.** § 9–305. A security interest in letters of credit and advices of credit (subsection (2)(a) of § 5–116), goods, instruments, negotiable documents or chattel paper may be perfected by the secured party's taking possession of the collateral. If such collateral other than goods covered by a negotiable document is held by a bailee, the secured party is deemed to have possession from the time the bailee receives notification of the secured party's interest. A security interest is perfected by possession from the time possession is taken without relation back and continues only so long as possession is retained, unless otherwise specified in this subtitle. The security interest may be otherwise perfected as provided in this subtitle before or after the period of possession by the secured party.

provides no definition. The Code's general purpose is to create a precise guide for commercial transactions under which businessmen may predict with confidence the results of their dealings. In defining "possession" we must be guided by these considerations as well as by the underlying theories unique to Article 9.

Under pre-code law, a security interest became invalid if the debtor was allowed uncontrolled dominion over the collateral.[9] Exercise of such ostensible ownership could perpetrate fraud on potential creditors who, not being able to know of the creditor's security interest, would think the collateral belonged to the debtor.

In contrast, creditors today can learn of pre-existing security interests through the filing provisions of the Code and a debtor's use of the collateral is no longer considered fraudulent, § 9–205.[10] Filing is required, with certain exceptions,[11] to perfect the security interest, so that creditors may learn of the pre-existing interest. "Possession" is used throughout Article 9 in establishing the filing scheme, in permitting debtors to retain use of collateral, and in providing perfection through means other than filing, such as through the secured party's taking possession. The ostensible ownership exercised through possession is demonstrated through simple physical control. One who controls the collateral possesses it, and leads others to believe it is his. Gilmore, a draftsman of Article 9, explains:

> "Receives possession" is evidently meant to refer to the moment when the goods are physically delivered at the debtor's place of business—not to the possibility of the debtor's acquiring rights in the goods at an earlier point by identification or appropriation to the contract or by shipment under a term under which the debtor bears the risk.

2 Gilmore, Security Interests in Personal Property 787 (1965).

---

**9.** Benedict v. Ratner, 268 U.S. 353, 45 S.Ct. 566, 69 L.Ed. 991 (1925). *See* comment 1 to § 9–205, which reads in part:

> This section provides that a security interest is not invalid or fraudulent by reason of liberty in the debtor to dispose of the collateral without being required to account for proceeds or substitute new collateral. It repeals the rule of Benedict v. Ratner * * * and other cases which held such arrangements void as a matter of law because the debtor was given unfettered dominion or control over the collateral.

**10.** § 9–205. Use or disposition of collateral without accounting permissible.

> A security interest is not invalid or fraudulent against creditors by reason of liberty in the debtor to use, commingle or dispose of all or part of the collateral (including returned or repossessed goods) or to collect or compromise accounts, contract rights or chattel paper, or to accept the return of goods or make repossessions, or to use, commingle or dispose of proceeds, or by reason of the failure of the secured party to require the debtor to account for proceeds or replace collateral. This section does not relax

the requirements of possession where perfection of a security interest depends upon possession of the collateral by the secured party or by a bailee.

**11.** §§ 9–302(1), (a) and (b), *supra,* n. 2. Comment 4 to § 9–302 reads in part:

> 4. Where goods subject to a security interest are left in the debtor's possession, the only exceptions from the general filing requirement are those stated in subsections (1)(c) and (1)(d): purchase money security interests in consumer goods and in certain farm equipment, other than fixtures and motor vehicles. In many jurisdictions under prior law security interests in consumer goods under conditional sale or bailment lease have not been subject to filing requirements. Subsections (1)(c) and (1)(d) follow the policy of those jurisdictions. The subsections change prior law in jurisdictions where all conditional sales and bailment leases have been subject to filing requirements.
>
> Although the security interests described in subsections (1)(c) and (1)(d) are perfected without filing, Section 9–307(2) provides that unless a financing statement is filed certain buyers may take free of the security interest even though perfected.

Pre-code security law defined possession as meaning physical control.[12]

Tender of delivery is a sales concept, employed by Article 2,[13] which binds a buyer and seller to contractual conditions. It affects their rights against each other. It would be a serious error to allow those private conditions to affect the carefully defined rights of creditors under Article 9.

Secured parties are required, in most cases, to file a financing statement in order to perfect their security interest. To define "possession" as requiring completion of tender of delivery terms would permit a secured creditor to delay performance of a tender of delivery term, and thereby avoid the filing requirement indefinitely. Even if a debtor would have use of the collateral he would not be deemed to have "possession," under the District Court's analysis, and purchase money security interest holders filing after complying with a tender of delivery term, at any future date, would still be entitled to the § 9–312(4) priority. Such a result would frustrate the purpose of Article 9 and could not have been intended by the drafters.[14]

To summarize, possession under § 9–312(4) is not dependent upon completion of tender of delivery terms which affect only the buyer and seller of the goods. Since the last of the binder parts were delivered to the bankrupt, in their crates, on June 2, possession of the collateral was received on that date. HMC's failure to file its financing statement until June 15, more than 10 days later, causes it to lose its favored position under § 9–312(4) and entitles FCA to the binder.

## IV

## APPLICABILITY OF § 9–103(3)— THE DISTRICT COURT'S ALTERNATIVE HOLDING

The District Court's alternative holding was that HMC obtained a perfected security interest in New York, when the binder's component parts were identified to the contract, § 9–204, the debtor having received rights in the collateral, since HMC was in possession of the component parts at that time, § 9–305. That interest continued perfected in Maryland, according to the District Court.

The third sentence of § 9–103(3) provides that a perfected security interest continues perfected for four months if the collateral is moved into another state. Under § 9–305 a secured party can perfect his security interest by taking possession of the collateral. HMC urges that we hold it acquired a perfected security interest under § 9–305 and that that perfected security interest continued for four months in Maryland. We reject this argument on several grounds.

12. [A] person who is in possession of a chattel is one who * * * has physical control of a chattel with intent to exercise such control in his behalf, or otherwise than as a servant on behalf of another * * *.

Restatement of the Law of Security (1941) at 6.

In Casey v. Cavaroc, 96 U.S. 467, 24 L.Ed. 779 (1877), a leading case defining possession in the security interest context, the term was understood to mean control. See also In re Spanish-American Cork Prod. Co., 2 F.2d 203 (4th Cir. 1924), cert. denied, 266 U.S. 634, 45 S.Ct. 225, 69 L.Ed. 479 (1925); Hamilton Ridge Lumber Sales Corp. v. Wilson, 25 F.2d 592 (4th Cir. 1928).

13. *Supra*, n. 5.

14. Brodie Hotel Supply, Inc. v. United States, 431 F.2d 1316 (9th Cir. 1970), is cited by HMC to stand for the proposition that mere physical control doesn't constitute possession under § 9–312(4). But *Brodie* is inapposite, being a case where the debtor had physical control *before* the goods were sold to him by the holder of the purchase money security interest and before the security agreement was entered into. Since HMC had contracted for the sale with the bankrupt on January 30, and entered into a security agreement, the bankrupt was in possession from June 2, when it received physical control of the collateral.

First, it is not clear to us that the taking of possession, spoken of in § 9–305, can be effectuated by merely not relinquishing control. HMC had not relinquished control of the binder to the bankrupt at the time it sent the bankrupt the May 22 notice. The binder never had left HMC's control. We are not certain that this is what § 9–305 means by the secured party taking possession. Perhaps the secured party must take possession from the debtor, who has possession, in order to demonstrate the ostensible ownership which indicates the perfected security interest to other potential creditors. This issue need not be decided, since ample grounds exist upon which we base our reversal of this alternative holding.

█ When HMC gave the binder to the common carrier in New York in late May, it relinquished possession of the machine. § 9–305 allows possession by the creditor to perfect his interest " * * * only so long as possession is retained." The common carrier issued a non-negotiable bill of lading naming the bankrupt as consignee. Under § 9–305 collateral held by a bailee, such as the common carrier, under a non-negotiable document is considered to be in the possession of the secured creditor only from the time the bailee receives notice of the secured creditor's interest. No evidence was presented to show that the carrier received such notice. Therefore, HMC's § 9–305 perfection, if it existed at all, didn't "continue" when the binder was removed from New York to Maryland.

█ A third ground for rejecting applicability of § 9–103(3) is predicated upon an understanding of the interrelation of the various parts of that section. Even if HMC acquired a perfected security interest under § 9–305, the continuation didn't take place under § 9–103(3). The second sentence of § 9–103(3) compels our conclusion. When the parties, such as HMC and the bankrupt, agreed and knew that the collateral would be transported to the second state within 30 days, for use there, " * * * the validity of the security interest in this State [the second state, Maryland in the instant case] is to be determined by the law of this State [Maryland]." We should interpret the term "validity" as meaning the "perfection," [15] so that the perfection must have occurred in Maryland in order for HMC to have perfected its security interest.

█ Analysis of the underlying policy of § 9–103(3) supports our reading and conclusion. The section was designed to protect secured parties whose debtors absconded with their collateral.[16]

15. The second sentence of § 9–103(3) provides that, when goods are in State A at the time a security interest attaches but are intended to be "kept" in State B (and are in fact brought into State B for use within thirty days after attachment), State B will apply its own law to determine the "validity" of the security interest. *In this context there is no conceivable reason for differentiating between "validity" and "perfection"*: that differentiation makes sense only when the goods were initially expected to remain in State A and the parties contracted with reference to that state's law; in such a case, if the goods are subsequently removed to State B, it is entirely sensible to provide (as § 9–103(3) does) that "validity" continues to be governed by State A law although "perfection" (after the four-month delay) becomes a matter of State B law. But when the goods were at all times intended for use in State B, then both validity and perfection should be State B matters; indeed the case for making State B law govern initial perfection is even stronger than the case for making it govern validity. Since the second sentence of § 9–103(3) is crystal-clear on the validity point, it would be difficult to explain why the following sentence on perfection should take an apparently inconsistent position. (Italics added.)
1 Gilmore at 629.

16. Comment 7 to § 9–103(3) reads in part: Subsection (3) proceeds on the theory that not only the secured party whose collateral has been removed but also creditors of and purchasers from the debtor in this state should be considered. The four month period is long enough for a secured party to discover ·

When the secured party *knows* where the collateral is to be taken, and that the transfer will take place within the short period of 30 days after the security interest attached, there is no reason or justification for allowing the secured party (HMC) to delay filing in the second state (Maryland).

The section's underlying policy provides an even stronger basis for rejecting the District Court's holding that the 4-month grace period of § 9–103(3)'s third sentence applied to HMC. As explained above, the section was designed to protect creditors from absconding debtors. A secured party is allowed four months to find the debtor and collateral, and file in the new state, without losing the original perfection accorded him in the first state. This protection is certainly not required where a secured party, such as HMC, itself transferred the collateral to another state pursuant to a contract with the debtor. HMC knew where the collateral was. The general Code requirement to perfect through filing in Maryland should have been met.

██ ██ We are further of the view that in a situation such as this, where the creditor who was in possession shipped the goods to the debtor in another state, pursuant to a non-negotiable bill of lading, the § 9–305 perfection does not apply to allow the creditor's perfected interest to continue in the second state. When a secured party takes possession of the goods, it knows where they are located. The § 9–305 perfection lasts only as long as possession is

retained by the secured party. When possession is surrendered, the perfection ceases. Therefore, when a secured party itself transfers the goods to a second state, with the debtor as consignee under a non-negotiable bill of lading, it should follow the Code's strict filing scheme to perfect, before relinquishing control to the debtor. A § 9–305 perfection is not the type of perfection that § 9–103(3) was designed to allow to continue for the 4-month grace period in such a situation.

Since the 4-month grace period of protection is not necessary in such a case, the Code could not have intended that it apply. HMC was not faced with the difficult task of finding a debtor who had fled with its collateral. It knew where the debtor was and where the collateral was. Indeed, HMC itself transported the collateral to Maryland.

§ 9–103(3) was designed to protect creditors against *debtors'* moving the collateral, not to allow secured parties a 4-month exemption from filing under all circumstances.

Since the § 9–103(3) 4-month grace period from filing was designed to protect secured parties from debtors absconding with the collateral, it does not apply to HMC, a secured party, who knowingly transferred the collateral, pursuant to a non-negotiable bill of lading.

For all the reasons stated above in sections III and IV, the judgment of the District Court is

Reversed.

in most cases that the collateral has been removed and to file in this state; thereafter, if he has not done so, his interest, although originally perfected in the state where it attached, is subject to defeat here by those persons who take priority over an unperfected security interest. * * *

*See also* Weintraub, Choice of Law in Secured Personal Property Transactions: The Impact of Article 9 of the Uniform Commercial Code, 68 Mich.L.Rev. 684, 712–714 (1970).