In the Matter of **ULTRA PRECISION INDUSTRIES, INC.,** a California corporation, Bankrupt (two cases).

**NATIONAL ACCEPTANCE COMPANY OF CALIFORNIA, Petitioner-Appellant,**

v.

**COMMUNITY BANK, et al., Respondent-Appellee.**

**NATIONAL ACCEPTANCE COMPANY OF CALIFORNIA, Petitioner-Appellant,**

v.

**WOLF MACHINERY COMPANY, Respondent-Appellee.**

Nos. 72-3088, 72-3089.

United States Court of Appeals, Ninth Circuit.

Sept. 18, 1974.

Joseph Weissman (argued), of Buchalter, Nemer, Fields & Savitch, Los Angeles, Cal., for appellant.

George E. Leaver (argued) of Getz, Aikens & Manning, Los Angeles, Cal., for appellee Community Bank.

Frank A. Riehle, Jr. (argued), Los Angeles, Cal., for appellee Wolf Machinery Co.

Before CHAMBERS and CARTER, Circuit Judges, and EAST, Senior District Judge.*

## OPINION

EAST, Senior District Judge:

### THE APPEAL

National Acceptance Company of California (National) appeals from the two several orders of the District Court denying its Petition for Review and affirming the referee's two several rulings or orders that the security interest held by Community Bank (Bank) and Wolf Machinery Company (Wolf) in three large Rigid Hydro Copy Profiling Machines, numbered 5890 and 5910 (Bank) .and machine numbered 5934 (Wolf), respectively,[1] had priority over a conflicting security interest held by National. § 9312(4) of the Uniform Commercial Code of California (Code). We affirm.

### FACTS

The pertinent facts are:

National loaned Ultra Precision Industries, Inc. (Ultra) $692,000, and to secure the repayment of that sum, Ultra on or about March 7, 1967, executed in favor of National a Chattel Mortgage Security Agreement covering specifically described equipment of Ultra. National

---

* Honorable William G. East, Senior United States District Judge for the District of Oregon, sitting by designation.

1. These machines are large complicated precision pieces of equipment, weighing 16,000 to 20,000 pounds each.

perfected its security interest by timely filing a Financing Statement. The Chattel Mortgage Security Agreement and the Financing Statement contained the usual after-acquired equipment security clauses; however, without reference to any specific property.

■ Subsequent to the acquisition of National's security interest and during 1967 and 1968, Ultra placed orders with Wolf for two of the machines, later identified as machines numbered 5890 and 5910. It was agreed between Ultra and Wolf that after those machines had been shipped to Ultra and installed, Ultra would be given an opportunity to test them in their operations during a reasonable testing period,[2] and, further, that arrangements satisfactory to Ultra for outside financing was a condition precedent to the ultimate purchase of those machines. The machines were delivered to Ultra on April 30, 1968 and June 20, 1968, respectively, satisfactory testing was accomplished, outside financing obtained, and on July 31, 1968, Ultra and Wolf executed a Purchase Money Security Interest Conditional Sales Agreement (Security Interest Agreement) covering the sale of those two machines by Wolf to Ultra, and as a part of the outside financing arrangement, Wolf in consideration of the payment of $128,122.20 assigned the Security Interest Agreement to Bank. Bank's security interest was perfected by the filing of a Financing Statement on August 5, 1968.[3]

In June, 1968, Ultra placed another order with Wolf for a similar machine, later identified as machine numbered 5934, under identical terms of testing and purchase as those for the purchase of the above numbered machines 5890 and 5910. The machine was delivered to Ultra on August 7, 1968, satisfactory testing was accomplished, outside financing obtained, and on October 23, 1968, Ultra and Wolf executed a similar Security Interest Agreement covering the sale of the machine numbered 5934 by Wolf to Ultra, and as a part of the outside financing arrangement, Wolf, for value received, assigned the Security Interest Agreement to C.I.T. Corporation. C.I.T. Corporation's security interest was perfected by the filing of a Financing Statement on October 30, 1968. On October 7, 1969, C.I.T. Corporation reassigned the Security Interest Agreement to Wolf when Ultra became bankrupt.

### ISSUE

The priorities among the three security interests involved are determined by the application of § .9312(4), which reads:

"A purchase money security interest in collateral other than inventory has priority over a conflicting security interest in the same collateral *if the purchase money security interest is perfected at the time the debtor receives possession of the collateral or*

2. The machines were shipped directly from Europe by Cosa (a distributor) to the plant of Ultra as a matter of convenience, rather than to Wolf and then to Ultra. This practice is customary in the industry with respect to machines of the size and weight involved. "These machines are relatively complicated machines to get them right," [Rep. Tr. p. 73, lines 24–25], they take four to five days to install [Rep.Tr. p. 53], and it is not at all unusual that the machines have various assemblies and adjustments for a period of 90 days, and in the case of Machine 5890, even longer [Rep.Tr. pp. 116 and 117].

3. The general purpose of the Uniform Commercial Code is to create a precise guide for commercial transactions under which businessmen may predict with confidence the results of their dealings and avoid the confusion arising from a debtor's ostensible dominion of property then burdened with an outstanding secret security interest. The requirement of strict compliance with the filing provisions is the prime virtue of the Code. Today filing is required to perfect the security interest so that creditors may learn of *pre-existing* security interests. See In Re Automated Bookbinding Services, Inc., *infra*.

*within 10 days thereafter.* (emphasis added):"

The sole issue presented by the facts and the contention of the parties on appeal is: On what dates did Ultra become "the debtor [receiving] possession of the collateral [the three respective machines]" within the meaning of § 9312(4)?

## DISCUSSION

Briefly stated, National contends that Ultra was its "debtor" in "possession of the collateral" at the moment it received physical delivery of the respective three machines, without regard to any agreement to the contrary between Wolf and Ultra as to the terms and conditions of the ultimate sale and purchase of the machines respectively; hence, the machines were within the grasp of the after-acquired property clause. Since the Security Interest Agreements held by Bank and Wolf were not perfected within ten days "thereafter" as commanded by § 9312(4), they are unenforceable as against National's perfected security interest.

Bank and Wolf each contend that Ultra did not become their "debtor" in "possession of the collateral" (the three respective machines) until the terms and conditions of the proposed sales and purchases thereof had been met and the Security Interest Agreement had been executed and delivered. We subscribe to that contention.

Section 9105(1) of the Code provides:

"(1) In this division unless the context otherwise requires:

"(d) 'Debtor' means the person who owes payment or other performance of the obligation secured . . . ."

■ National urges that the term "debtor" as used in § 9312(4) means the debtor under its "conflicting security interest." Such an interpretation does violence to the clear language of the section, and such a thesis is inherently rejected under the rationale and holdings in Brodie Hotel Supply, Inc. v. United States, 431 F.2d 1316 (C.A.9 1970), and In Re Automated Bookbinding Services, Inc., 471 F.2d 546 (C.A.4 1972). To us, the word "debtor" in § 9312(4) means the debtor of the seller or holder of the "purchase money security interest in collateral" (the thing sold).

■ It is manifest that Ultra was not a "debtor" of Wolf and did not owe payment or other performance of the obligation secured unto Wolf until the moment of the execution and delivery of the Security Interest Agreements on July 31, 1968 and October 23, 1968, respectively. Suffice to say that prior to those dates, (a) Wolf held no definitive security interest in the machines which could be perfected by the filing of a Financing Statement, and (b) Ultra held no assignable legal interest in the machines which could fall into the grasp of National's after-acquired property security clause.

We hold that Ultra became the purchase money security interest "debtor [receiving] possession of the collateral [the three respective machines]" at the instant of the execution and delivery of the Security Interest Agreements, respectively, and not before; and, further, that since each of the Security Interest Agreements were timely perfected, the security interests of Wolf and Bank, respectively, are each prior and superior to the conflicting security interest held by National. *Brodie, supra.*

National's side contention that the Alaskan statute dealt with in *Brodie* contains a material variance from the wording of § 9312(4) is without merit.

So far as we are advised, the Supreme Court of California has not addressed the issue presented here. National strongly urges that if the Court of California were considering this controversy, it would not follow *Brodie* and instead would adopt the date of delivery interpretation of § 9312(4) espoused in In Re Automated Bookbinding Services,

Inc., *supra*. However, National fails to recognize and acknowledge the fatal impact of Footnote 14 to that Court's opinion, at page 553, upon its claim under the instant facts. Footnote 14 reads as follows:

"Brodie Hotel Supply, Inc. v. United States, 431 F.2d 1316 (9th Cir. 1970), is cited by HMC [the holder of the purchase money security interest] to stand for the proposition that mere physical control doesn't constitute possession under § 9–312(4). But *Brodie* is inapposite, being a case where the debtor had physical control *before* the goods were sold to him by the holder of the purchase money security interest and before the security agreement was entered into. Since HMC had contracted for the sale with the bankrupt on January 30, and entered into a security agreement, the bankrupt was in possession from June 2, when it received physical control of the collateral."

We envision the Court of California as adopting the rationale and holding of *Brodie* when considering the issue under the facts here presented. Any other interpretation would vitiate the special priority status granted to holders of perfected purchase money security interests under the provisions of § 9312(4) over holders of conflicting security interests in the same collateral.

The record as a whole reveals good faith, above board, uninvolved commercial credit transactions, without any withholding on the part of or secret equities among the parties. National was in no way misled by any acts of Wolf or Bank giving rise to an estoppel, and National advanced no money or credit on the strength of Ultra's pre-Security Interest Agreement possession of the machines. Wolf was entitled to abide with the terms and conditions of the proposed sales and purchases of its machines and to perfect its ultimate Security Interest Agreements in accordance with § 9312 (4).

Affirmed.