793 P.2d 1257

VALLEY BANK, an Idaho banking corporation, Plaintiff–Appellant,

v.

ESTATE OF Burton RAINSDON, deceased, Thelma T. Rainsdon, personal representative, and Thelma R. Rainsdon, Defendants–Respondents.

No. 17614.

Court of Appeals of Idaho.

June 5, 1990.

Anderson, Pike & Bush, Idaho Falls, for plaintiff-appellant. Scott R. Hall argued.

Moss & Luke, Blackfoot, for defendants-respondents. Thomas E. Moss argued.

SWANSTROM, Judge.

This action is between two secured creditors who claim priority in the proceeds from the sale of the debtor's collateral. The district court granted summary judgment to Thelma Rainsdon, holding that she and her late husband, Burton, had a purchase money security interest which was of first priority. The other secured creditor, Valley Bank, has appealed. We are asked to decide whether Burton and Thelma Rainsdon timely perfected their purchase money security interest. We hold that the security interest was not timely perfected under I.C. § 28-9-312(4). We vacate the summary judgment and remand the case for further proceedings.

Prior to 1981, Burton and Thelma Rainsdon (the Rainsdons) were involved in a cattle-raising operation. For convenience of discussion only, we refer to these animals as Burton's cattle. In the spring of 1981, Burton became ill and requested that his

son, Robert Rainsdon, care for approximately 150 head of his cattle. As a result of Burton's request, Robert moved the cattle to Hamer, Idaho, and placed them with cattle that he and his wife, Janice, owned. Whenever he could, Burton made trips to inspect his cattle and to oversee their care. However, eventually he realized he would be unable to resume his cattle operation.

In the spring of 1982, an agreement was reached between Burton and Thelma Rainsdon and Robert and Janice Rainsdon that Robert and Janice would purchase 100 head of Burton's best cows and their calves, the rest to be culled from the herd and sold on the market by Burton and Thelma. A short "memorandum agreement," bearing a date of March 23, 1982, was signed by the Rainsdons sometime between March 31 and April 6. The agreement recited that Burton and Thelma "[do] hereby sell to Robert and Janice Rainsdon, husband and wife, 100 head of beef cows branded with a 'BR' on the right rib, including the 1982 offspring (calves) from said cows, which are presently in the possession of said Robert B Rainsdon and Janice Rainsdon." The agreement also recited that the sellers, Burton and Thelma, would "retain a [purchase money] security interest in the cows only...." Robert and Janice also signed a promissory note dated March 23, 1982, for $37,500 payable in four annual installments. Burton and Thelma did not file a financing statement (Idaho Form UCC–1) for this transaction until April 30, 1982.

In the meantime, on March 26, 1982 Robert and Janice contacted Valley Bank to discuss renewal of their annual operating line of credit. During this visit, Robert and Janice informed Valley Bank that they were planning on purchasing 100 cows and calves from Burton and Thelma. Valley Bank was informed that Burton and Thelma were taking a security interest in the 100 cows. An unsigned copy of the Rainsdons' memorandum agreement was given to the bank at that time. That same day, Valley Bank agreed to advance funds to feed and maintain Robert and Janice's cat-

tle, as well as the 100 cows and calves to be purchased from Burton and Thelma. A security agreement was executed between Valley Bank and Robert and Janice on March 26, 1982. This security agreement granted Valley Bank a security interest in "all debtors' livestock, increase thereof, additions and replacements thereto, now owned or hereafter acquired." No financing statement was filed because Valley Bank had previously filed financing statements on March 8, 1978, and January 22, 1980. These previously filed financing statements covered "all livestock now owned or hereafter acquired."

Robert and Janice were unable to make the first payment on Burton's cattle, which came due on March 23, 1983. Valley Bank agreed to advance $12,346, the amount of the installment due. An additional payment of $3,000 was made by Robert and Janice on September 24, 1984. This last payment represented interest accrued on the promissory note through January 31, 1985. Robert and Janice later defaulted on the payments owed to Valley Bank and to Burton and Thelma in 1984. As a result of the default, all cattle in the possession of Robert and Janice were liquidated. The proceeds from the sale of the cows purchased from Burton are the subject of this litigation.

As noted, Valley Bank had a perfected security interest in all of Robert's cattle by virtue of the security agreement dated March 26, 1982. This security interest extended as well to any after-acquired livestock. The cattle being purchased from Burton were specifically included in the numbers of cattle listed in this security agreement prepared by Valley Bank. This does not necessarily mean, however, that Valley Bank's security interest was anything more than a general security interest, as opposed to a purchase money security interest. The money Robert and Janice borrowed from the bank in 1982 was intended for operating funds and not for purchasing Burton's cattle. Robert and Janice contemplated that sales of the off-

spring of Burton's cattle would be the source of funds to pay the debt to Burton and Thelma. This did not occur.

Valley Bank contends that because it advanced $12,346 for the first installment it acquired the status of a lender with a purchase money security interest, at least in the amount of this advancement. *See* I.C. § 28–9–107(b). However, in *North Platte State Bank v. Production Credit Ass'n*, 189 Neb. 44, 200 N.W.2d 1, 6 (1972), it was held that

> a security interest cannot become a purchase money security interest unless it is taken by a person who by making advances or incurring an obligation gives value to enable the debtor *to acquire rights in or the use of collateral* if such value is in fact so used. [Emphasis original.]

Here, as in *North Platte State Bank,* the money advanced by the bank was not used by the debtor (Robert) to acquire any rights in the cows or the use of them because he already had all the possible rights in the cows he could have. *Accord, Wade Credit Corporation v. Borg–Warner Acceptance Corporation,* 83 Or.App. 479, 732 P.2d 76 (1987).

Nevertheless, Valley Bank's general security interest was perfected earlier in time than was Burton's security interest. Accordingly, Burton could not prevail unless he had the super priority of a purchase money security interest. This would require that he had filed under I.C. § 28–9–312(4) so as to perfect his purchase money security interest. Alternatively, he might prevail if Valley Bank subordinated its security interest to Burton's security

interest or if the bank were estopped to assert a prior security interest. Thelma has asserted each of these defenses. The district court addressed only the first, holding that Burton and Thelma enjoyed a super priority under I.C. § 28–9–312(4). This section states:

> A purchase money security interest in collateral other than inventory has priority over a conflicting security interest in the same collateral or its proceeds *if the purchase money security interest is perfected at the time the debtor receives possession of the collateral or within ten (10) days thereafter.* [Emphasis added.]

The district court found that although Robert had possession of his parents' cattle for a long period of time, Robert was a mere caretaker without rights in the cattle until the purchase agreement was signed. During this time he was not a "debtor." While Burton's cattle were mixed with Robert's cattle, Burton's cattle continued to bear his brand.[1] Robert's position, according to the district judge, was that of a mere bailee. He had no rights in "collateral" to which a security interest could attach. *See, e.g., Brodie Hotel Supply, Inc. v. United States,* 431 F.2d 1316 (9th Cir.1970); *In re Prior Bros. Inc.,* 29 Wash.App. 905, 632 P.2d 522 (1981).

Valley Bank contends that once Robert and Janice signed the memorandum agreement dated March 23, 1982, Robert became a "debtor receiv[ing] possession of the collateral" within the meaning of I.C. § 28–9–312(4). Robert and Janice dispute this view. They offered evidence—extrinsic to the written purchase agreement— that the parties' agreement was more de-

---

1. Idaho Code § 25–1204 provides that "a recorded brand shall be prima facie evidence of ownership of livestock, and that such owner is entitled to possession of said livestock." In *Whitworth v. Krueger,* 98 Idaho 65, 69, 558 P.2d 1026, 1030 (1976), our Supreme Court noted, however, that under I.C. § 28–9–202 title to collateral is immaterial. The Court said:

> title, or indicia of title such as a brand, is immaterial in determining the rights of the parties because their rights are determined

solely by the nature of their security interest and the priority of their security interest. Therefore, the brand upon the cattle in question does not bear upon the rights of these parties in this case.

Nevertheless, the existence of Burton's brand may be material in regard to the defenses of estoppel and subordination which have been asserted by Thelma Rainsdon. We do not decide those issues in this opinion.

tailed than was expressed in the writing. According to affidavits and deposition testimony of Robert and Thelma, Robert was given the right to select 100 of the best cows and calves from Burton's herd. Because the cows were calving during the spring, this selection would not be accomplished until calving was completed. The Rainsdons contended that until the 100 cows and calves were identified or selected by Robert he was not a debtor in possession of collateral within the meaning of I.C. § 28–9–312(4).

■ The district court accepted the Rainsdons' arguments. The court admitted the parol evidence, holding that the written purchase agreement was not a complete expression of the parties' contract and that, because the parol evidence did not contradict the writing but was supplementary to it, the parol evidence was admissible to show the actual intent of the parties. In admitting this evidence, the district court relied upon the provisions of I.C. § 28–2–202 and upon *Ace Supply, Inc. v. Rocky–Mountain Machinery Co.,* 96 Idaho 183, 525 P.2d 965 (1974). We believe the court's decision to admit this evidence was correct. *See, e.g., In re Prior Bros., Inc., supra.* Based on this evidence, the court found that between June 4 and June 10, 1982, Robert and his parents separated out the best 100 cows and calves and thereby identified the cattle which were subject to the purchase agreement. The court concluded that "possession" of the cattle as contemplated by I.C. § 28–9–312(4) did not occur until the 100 cows and calves were identified or "delivered" to Robert. The court said that this "delivery" event triggered the ten-day filing period. Because Rainsdon filed a financing statement four to ten days before such "delivery," Rainsdon's purchase money security was timely perfected. We disagree.

■ The district court cited no authority for holding that the "delivery" date controlled rather than the date when the purchase agreement was signed. Rainsdon ar-gues that *In re Badger Aluminum Extrusion Corp.,* 7 B.R. 251 (Bankr.S.D.N.Y. 1980) supports the district court's ruling. *Badger* is a case following the general rule that under § 9–312(4) "possession" not the date of sale, is the determinative factor. "Possession," the court said, "is triggered by physical control," not by a statement in a sales document signed by the purchaser indicating an earlier date of acceptance and delivery. *Id.* at 253. *Badger* involved a sale of a large diesel "generator set." The set was purchased on July 28, 1977, the date the contract was signed. The bare generator was physically delivered to the buyer the next day. The seller did not file its financing statement for another eighteen days. However, major component parts of the generator set were delivered during August and October. The court held that "Badger did not 'possess' the generator set before the time that it received the last of the component parts on October 17, 1977." *Id.* Consequently, the seller was held to have a validly perfected purchase money security interest.

Here, unlike *Badger,* when Robert and his parents signed the sale agreement Robert was in possession of all of the collateral. He was also in possession of livestock that eventually would be culled; but this does not alter the fact that he acquired rights in the collateral, specifically the right to select any of the cows and calves then born to make up the 100 pairs of cows and calves, when the agreement was signed. Robert then became a debtor in possession of the collateral. He gave value. He signed a promissory note payable to his parents, which began to accrue interest on March 23, 1982.

■ The district court did not find specifically when the Rainsdon security agreement was signed. The court found only that it "was formalized some time in April 1982." However, the evidence shows that the agreement was signed on or before April 6. Construing the evidence most favorably to the Rainsdons, we hold that April 6 is the date when the Rainsdons'

security interest "attached." By that date "the debtor [had] signed a security agreement which contains a description of the collateral ... value [had] been given; and the debtor [had] rights in the collateral." I.C. § 28–9–203. *See also First Security Bank of Idaho, N.A. v. Woolf,* 111 Idaho 680, 726 P.2d 792 (Ct.App.1986).

Selection of the 100 cows and calves which were being purchased by Robert was not an event which postponed the filing requirements. This was an on-going process that began even before the cows were ready to calve. The process continued through the spring of 1982 until about June 10. At various times, Robert and his father segregated lower quality cows from the herd until Robert placed the remaining 100 head of cows and calves on summer range. We cannot accept the Rainsdons' argument that this selection process delayed the filing requirement. Such a rule would inject too much uncertainty into commercial transactions. "The Code's general purpose is to create a precise guide for commercial transactions under which businessmen may predict with confidence the results of their dealings." *NBD–Sandusky Bank v. Ritter,* 179 Mich.App. 580, 446 N.W.2d 340, 341–42 (1989), *quoting In re Automated Bookbinding Services, Inc.,* 471 F.2d 546, 552 (4th Cir.1972).

Under the Rainsdons' view, a seller could delay indefinitely the filing of a financing statement showing his security interest in cattle in possession of the buyer, awaiting such time as the buyer made a final selection of the last animal. Such an anomaly was the central concern of the court in *Automated Bookbinding Services, supra.* There, the court was considering a "tender of delivery" term which required the seller to assemble machinery parts it had delivered to the buyer's place of business. *See, e.g.,* I.C. §§ 28–2–503, –507. The seller's financing statement was not timely filed unless the debtor was deemed to have received "possession" only when installation was completed. The court held:

Tender of delivery is a sales concept, employed by Article 2, which binds a buyer and seller to contractual conditions. It affects their rights against each other. It would be a serious error to allow those private conditions to affect the carefully defined rights of creditors under Article 9.

Secured parties are required, in most cases, to file a financing statement in order to perfect their security interest. To define "possession" as requiring completion of tender of delivery terms would permit a secured creditor to delay performance of a tender of delivery term, and thereby avoid the filing requirement indefinitely. Even if a debtor would have use of the collateral he would not be deemed to have "possession," under the District Court's analysis, and purchase money security interest holders filing after complying with a tender of delivery term, at any future date, would still be entitled to the § 9–312(4) priority. Such a result would frustrate the purpose of Article 9 and could not have been intended by the drafters.

To summarize, possession under § 9–312(4) is not dependent upon completion of tender of delivery terms which affect only the buyer and seller of the goods. [Footnotes omitted.]

471 F.2d at 553.

Accordingly, we hold that "possession" for the purpose of I.C. § 28–9–312(4) should not be construed to mean the time when Robert completed selection of 100 cows from Burton's herd. The Rainsdons' ten-day grace period for filing a financing statement commenced on April 6, 1982, when the security agreement was executed and the Rainsdons were in possession of all the cows. We believe this holding is consistent with the purposes of the Uniform Commercial Code to provide a readily ascertainable date from which parties' rights can be determined. Although the factual situations vary widely from case to case, we believe that our decision is supported by the great majority of the cases we have

examined, including the cases cited herein.[2] The judgment in favor of Thelma Rainsdon must be vacated and the case remanded for further proceedings.

Because the district court decided the Rainsdons' purchase money security interest was timely perfected, it did not need to decide whether there is merit to Thelma Rainsdon's assertions that Valley Bank subordinated its security interest or is otherwise estopped to assert a prior security interest. Because these issues can only be decided upon specific facts not yet determined, we must remand the case to the district court for further proceedings.

Costs to appellant Valley Bank. No attorney fees awarded.

BURNETT, J., and HART, J., Pro Tem., concur.

2. Some cases hold that where goods are delivered to a prospective buyer for his approval and acceptance, no security interest attaches until the "buyer" accepts and agrees to purchase the goods. *See, e.g., In re Hooks,* 40 B.R. 715 (Bankr.M.D.Ga.1984); *In re Prior Bros. Inc., supra.* We believe, however, that the present case cannot be characterized as a sale on approval. Moreover, these cases hold that where the prospective purchaser does decide to accept the delivered goods and signs a purchase agreement, the grace period for the seller to perfect a purchase money security interest commences to run at that time. Thus, these cases too support our view in the present case.