**In re RELPAK CORPORATION, Debtor.**

**EVER READY MACHINISTS,
INC., Plaintiff,**

**v.**

**RELPAK CORPORATION, Defendant.**

**Bankruptcy No. 181–11496–21.
Adv. No. 181–0460–21.**

United States Bankruptcy Court,
E. D. New York.

Nov. 24, 1982.

Eugene P. Edwinn, New York City, for plaintiff.

Rosenberg & Rosenberg, Brooklyn, N.Y., for debtor-defendant; Louis P. Rosenberg, Brooklyn, N.Y., of counsel.

Otterbourg, Steindler, Houston & Rosen, P.C., New York City, for Gibraltar Corp. of America, Intervenor; Morton L. Gitter, Warren R. Graham, New York City, of counsel.

## OPINION

CECELIA H. GOETZ, Bankruptcy Judge:

This adversary proceeding, which started as a routine application for relief from the automatic stay imposed by 11 U.S.C. § 362 so as to permit foreclosure of various purchase money security interests, has evolved into a contest as to the priority of the security interests in the debtor's equipment. Moreover, the creditor claiming priority denies that plaintiff possesses any security interest in such equipment whatsoever.

Relpak Corporation ("Relpak"), the nominal defendant, filed for relief under Chapter 11 of Title 11 of the United States Code on May 15, 1981. On August 21, 1981, the plaintiff herein, Ever Ready Machinists, Inc. ("Ever Ready"), brought an adversary proceeding against Relpak pursuant to Bankruptcy Rule 701(6) to obtain relief as authorized by § 362(e) of Title 11 from the Code's automatic stay.

According to the complaint, Relpak owed Ever Ready over $600,000, and Ever Ready requested permission to foreclose on the collateral securing this debt, consisting of equipment, the subject of nine sales. A negotiated settlement between Relpak and Ever Ready appeared possible until Gibraltar Corporation of America ("Gibraltar") intervened on February 25, 1982. Gibraltar alleged that Relpak owed it over $4,000,000 for which it held a floating lien on all Relpak equipment which was superior to that of Ever Ready, requiring that any proceeds from the sale of that equipment be used first to satisfy its lien. Alternatively, Gibraltar alleged that each of the nine security agreements must be considered separate and apart from the balance so that:

"[u]pon payment of the specific indebtedness due Plaintiff which is secured by each separate security agreement and security interest, the respective security interest of Plaintiff is discharged and any equity arising from disposition of the property thereafter is subject to the claims of Gibraltar which are superior to those asserted by Plaintiff." Answer of Intervening Defendant Gibraltar Corporation of America, at 2–3.

After Gibraltar intervened, Relpak took no further part in the proceeding and did not participate in the trial. No pretrial order was ever entered.

## THE FACTS

The record in this case is spare in the extreme and consists almost exclusively of the security documents held by Gibraltar and Ever Ready flushed out by some testimony respecting when the pieces of equipment in which Ever Ready claims a purchase money security interest were delivered. Other facts have been stipulated. There is no disputed evidence for the Court to resolve.

On April 20, 1972, Relpak gave Gibraltar a security interest in "all present and hereafter acquired Equipment of Debtor [Relpak] wherever located, together with all additions, replacements, accessions and improvements thereto." This agreement was duly filed with the Secretary of State, New York, on April 26, 1972, and with the Register of Queens County, New York, on March 2, 1973. A similar agreement was entered into on June 26, 1975 and filed with the Secretary of State, New York, on June 30, 1975, and with the Register of Queens

County, New York, on July 2, 1975 [1] (Intervenor's Exhibit A).

At the time Relpak filed for relief under Chapter 11, it owed Gibraltar over $5,000,-000 and that debt has not been reduced (Tr. 36). The value of the Ever Ready equipment is insufficient to satisfy Relpak's obligations to Gibraltar.

Subsequent to the time that Relpak gave Gibraltar a floating lien on all its equipment, Ever Ready made nine sales of equipment to Relpak. Each sale was handled in the same way.

In connection with each sale, Relpak and Ever Ready entered into an agreement prepared, in each case, by Ever Ready, containing a paragraph reading as follows:

"As security for the said indebtedness and also to secure any other indebtedness or liability of the Debtor to the Secured Party direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising (all hereinafter called the 'obligations'), Debtor hereby grants and conveys to the Secured Party a purchase money security interest in the collateral, or receipts thereof, if any, and all additions and accessions thereto." (*E.g.*, PX–1, p. 1.)

The first paragraph of each agreement defines the "collateral" as the "property described in the schedule herein." The schedule lists the specific pieces of equipment which Ever Ready was selling to Relpak under that agreement.

Simultaneously with the execution of each agreement, Relpak gave Ever Ready a series of notes, all dated the same day as the agreement, covering the deferred amount of the purchase price of each piece of equipment. Financing statements relating to each transaction were filed with the New York Secretary of State and the Register of Queens County, New York, as to all the equipment but that covered by the agreement of February 2, 1977 which was filed only with the New York Secretary of State. Each financing statement described

the security as being only the specific piece or pieces of equipment sold that date.

The following table shows the exhibit number given each security agreement, the date of the agreement, and of the series of notes executed on the same day as the agreement, and the dates of filing of the financing statement with the New York Secretary of State and the Register of Queens County, New York:

| EXHIBIT NUMBER | DATE OF AGREEMENT AND NOTES | SECRETARY OF STATE FILING | QUEENS CO. FILING |
|---|---|---|---|
| 1 | 03/29/77 | 04/11/77 | 04/12/77 |
| 2 | 01/22/80 | 05/22/80 | 05/14/80 |
| 3 | 11/01/77 | 04/10/78 | 04/11/78 |
| 4 | 02/02/78 | 04/10/78 | – ? – |
| 5 | 07/09/80 | 09/29/80 | 09/26/80 |
| 6 | 08/01/77 | 08/10/77 | 08/10/77 |
| 7 | 05/10/77 | 05/26/77 | 05/26/77 |
| 8 | 01/17/79 | 06/01/79 | 05/11/79 |
| 9 | 02/01/78 | 04/11/78 | 04/11/78 |

(PX–10)

The testimony of Al Baron, President of Ever Ready, and the invoices produced by him covering the shipment of the machines to Relpak establish that delivery of each of the machines corresponding to the exhibit numbers took place as follows:

1. Delivery took place prior to March 22, 1977 (Tr. 13; Intervenor Ex. B).

2. Ever Ready was invoiced on February 28, 1980 for delivery, but it does not know when delivery took place (Tr. 17–18; Intervenor Ex. C).

3. Delivered on March 23, 1978 (Tr. 20–21; Intervenor Ex. D).

4. Delivered on February 2, 1978 (Tr. 21–22; Intervenor Exhibit E).

5. Delivered on or shortly after July 30, 1980 (Tr. 22–23; Intervenor Exhibit F).

6. The delivery date is not known.

7. Delivered May 4, 1977 (Tr. 23–25; Intervenor Exhibit G).

8. The best estimate on the delivery of the eighth machine is that it was delivered at the end of April, 1979, allowing for a transatlantic crossing (Tr. 25–26; Intervenor Exhibit H).

---

1. Gibraltar also has a security interest in Relpak's accounts receivable under an agreement entered into in 1972 and in its inventory under an agreement entered into in 1975.

9. The ninth machine was shipped out of Glendale, Illinois on March 31, 1978; exact date of arrival at Relpak's premises in Long Island City, New York, is not known (Tr. 27–28; Intervenor Exhibit I).

On March 17, 1977, just before Ever Ready made the first of the nine sales here involved, Gibraltar and Relpak entered into a letter agreement to which there was then added an acknowledgment by Ever Ready. In this document, Relpak requested Gibraltar to pay Ever Ready $98,565 to constitute full payment of Relpak's indebtedness to Ever Ready "of whatever nature, except only purchase-money indebtedness incurred or to be incurred on or about the date hereof in connection with our [Relpak's] acquisition from Ever Ready of the machine described below for which with your [Gibraltar's] consent we are trading in another machine also described below." Ever Ready, for its part, acknowledged receipt of the $98,565 from Gibraltar as being in satisfaction of all indebtedness from Ever Ready "except only purchase-money indebtedness owing with respect to and secured by Security Interest in the above-mentioned 'Acquired Machine.'" (PX–11.)

The record is barren of any explanation of the circumstances in which this document was drawn and executed. There is no testimony that because of its existence, Ever Ready ever did, or failed to do, anything that it might otherwise have done, or failed to do.

Ever Ready's complaint alleged that it is "the holder of perfected security interests in property of the estate of the debtor in the sum of $604,922.92 plus legal fees" as set forth in an annexed schedule. The schedule referred to sets forth separately the amount due with respect to each of the nine sales for principal, interest, and protest charges, and then adds:

"10. Open Account—covered by each security agreement—from 1/20/81

"Principal Due      $2,125.00
"Past Due Interest      1,130.60"

## DISCUSSION

Gibraltar's position is that (1) Ever Ready does not have any purchase money security interest in the various pieces of equipment it sold to Relpak because the language of each security agreement is too broad and covers more than the equipment involved; (2) even if the instrument created a purchase money security interest, Gibraltar has priority because Ever Ready failed to file within the time required to give a later purchase money security interest priority over an earlier floating lien; and (3) that Ever Ready cannot be deemed to be even a secured creditor because Gibraltar's lien exhausts the value of the equipment covered by Ever Ready's security interest with the result that Ever Ready, under 11 U.S.C. § 506, becomes an unsecured creditor.

### I.

Taking up first the issue of priority, priority is controlled by Article 9 of the New York Uniform Commercial Code. Section 312 of Article 9 lays down the rules governing priority among holders of security interest in the same collateral.

The basic principle is that priority depends on priority in filing or perfection (UCC § 9–312(5)).[2] However, the following exception to the general rule is carved out by subsection (4) of § 312:

"(4) A purchase money security interest in collateral other than inventory has priority over a conflicting security in the same collateral or its proceeds if the purchase money security interest is perfected at the time the debtor receives possession of the collateral or within ten days thereafter."

To qualify under this language, the purchase money security interest must be perfected before or within ten days of the

---

**2.** The relevant portions of § 312(5) read:

"(5) In all cases not governed by other rules stated in this section (including cases of purchase money security interests which do not qualify for the special priorities set forth in subsections (3) and (4) of this section), priority between conflicting security interests in the same collateral shall be determined according to the following rules:

"(a) Conflicting security interests rank according to priority in time of filing or perfection."

date on which the debtor receives possession. A nonpossessory purchase money security interest in equipment is perfected by the filing of a financing statement. UCC § 9–302; *In re Luckenbill,* 156 F.Supp. 129 (E.D.Pa.1957); 4 *Anderson,* Uniform Commercial Code § 9–302(17), at 269 (2d ed. 1971). Although it is difficult to understand why a delay of a few days in filing should forfeit the special protection given purchase money interests, the courts have refused to allow such interests the benefit of the priority given by UCC § 9–312(4) unless its terms are strictly met. *In re Automated Bookbinding Services, Inc.,* 471 F.2d 546 (4th Cir.1972); *National Cash Register Co. v. Firestone & Co.,* 346 Mass. 255, 191 N.E.2d 471 (1963); *In re Boiling Springs Construction Co., Inc.,* 3 B.R. 251 (Bkrtcy.E.D.N.C.1980).

In *In re Automated Bookbinding Services, Inc., supra,* a chattel mortgagee was given priority over an equipment seller which filed a purchase money security interest a mere 13 days after the debtor received possession of equipment, or only three days after the period fixed in subsection (4) of § 312.

The evidence establishes that Ever Ready came into possession of the equipment covered by Exhibits 1, 3, 4, 5, and 7 more than ten days *before* the filing required for perfection of a purchase money security interest under the Uniform Commercial Code took place. As for the equipment involved in these sales, it is clear that Gibraltar has priority.

Ever Ready seeks to undercut the evidence respecting delivery by asserting that essential parts were delivered after the filing dates. If so, it might well be able to come within NYUCC § 9–312(4). *See In re Badger Aluminum Extrusion Corp.,* 7 B.R. 251 (Bkrtcy.S.D.N.Y.1980). But Ever Ready offered no evidence of this character at the trial. All that the record shows are the delivery dates to which Ever Ready's president testified. The Court cannot decide this case on facts not in the record.

Ever Ready also urges that the date of "acceptance" by Relpak of the equipment should be decisive, not the date of delivery. Mr. Baron, Ever Ready's president, testified that after he received oral notification from Relpak that the machinery was acceptable, he would file the financing statements (Tr. 43–45). The policy reasons for rejecting a contention of this character were forcefully set forth by Senior Circuit Judge Simon E. Sobeloff, writing for a unanimous court in *In re Automated Bookbinding Services, Inc., supra.* There, the holder of a purchase money security interest in a bookbinding machine claimed that the bankrupt had not received possession until installation was completed, rather than when all the parts were received on the bankrupt's premises. Judge Sobeloff refused to read the word "possession" as meaning anything other than "simple physical control." 471 F.2d at 552. Regardless of when Relpak *accepted* Ever Ready's equipment, it enjoyed physical control upon delivery and that is the date on which it came into "possession" of such equipment within the meaning of the Uniform Commercial Code.

Up to now, we have been considering only those sales as to which the record establishes that delivery, and, therefore, possession, preceded perfection by more than ten days, but there are a group of sales as to which the record is unclear. The delivery date of the equipment covered by Exhibit 6 is not known, and the delivery dates of the equipment covered by Exhibits 2, 8, and 9 are speculative.

What is known about all four is that, except for Exhibit 6, the sale was made and the security agreement creating the security interest was executed more than ten days before the filing of the financial statement. Thus, except with respect to the equipment covered by Exhibit 6, possession may have preceded filing of a financial statement by more than ten days.

On the state of this record, who prevails? That question turns on who has the burden of proof. The policy expressed in the Uniform Commercial Code is to give priority to the secured creditor first in time. In this case, Gibraltar is clearly first in time; its financial statements were filed long prior to

those filed by Ever Ready. Ever Ready can only prevail if it brings itself within the exception carved out for purchase money security interests under certain conditions. It is a long-established rule of statutory construction that the person claiming the benefit of an exception must show himself to be covered by it. If the record is a blank—as this record now is—regarding whether a critical requirement of § 9–312(4) has been satisfied, the exception is not proved and the general rule prevails. As to the equipment covered by Exhibits 2, 8, and 9, Ever Ready has failed to show that delivery (or possession) and perfection were within ten days of one another.

Before leaving these security agreements, one further word is necessary. With respect to the equipment covered by Exhibit 9, Ever Ready makes the further argument that the conditions of § 9–312(4) must have been satisfied because the equipment covered by that sale did not leave Glendale, Illinois until March 31, 1978, just eleven days prior to the filing of the necessary financial statements. Ever Ready argues that shipment delivered for transportation on March 31, 1978 in Glendale, Illinois could not have arrived in Long Island City, New York until April 1, 1978, or later. However, the distance between the two locales—the only fact of which this Court can properly take judicial notice—does not compel that conclusion, likely as it may be. Therefore, as to this delivery, too, the record does not establish that Ever Ready comes within the exception to the general rule with respect to priority.

The only security interest as to which the record entitles Ever Ready to priority is that created by Exhibit 6. In the case of Exhibit 6, the financing statement was filed within ten days of the date on which the equipment was sold to Relpak and the security agreement signed. Regardless of when, subsequent to sale, delivery took place, either the financing statement was already on file, or filing followed within less than ten days. Provided that the financing statement is on file when the buyer receives possession, it is of no legal consequence how long it has been on file.

*In re Badger Aluminum Extrusion Corp., supra,* is instructive in this connection. In that case, a conditional sales contract covering a generator set was executed on July 28, 1977, and a financing statement was filed on August 16, 1977. Delivery began on July 29, 1977, but all the parts were not delivered until October 17, 1977. Bankruptcy Judge Galgay held that "for the purposes of § 9–312(4)," the debtor "did not 'possess' the generator set before the time that it received the last of the component parts on October 17, 1977. Consequently, the August 16, 1977 filing of the requisite financial statement was "timely" and gave the security interest created by the conditional sales contract priority over a floating lien.

While there is uncertainty regarding when the equipment covered by Exhibit 6 was delivered, there is no question but that it was delivered. And, for the reasons set forth above, whenever such delivery took place, the requirements for priority under § 312(4) were satisfied.

In sum, Gibraltar has priority with respect to all equipment but those pieces covered by Exhibit 6.

## II.

However, Gibraltar levels another challenge to Ever Ready's security interests. It claims that none of Ever Ready's agreements qualifies as creating a purchase money security interest because each agreement recites that the collateral covered by that agreement is security not only for the purchase price, but also "any other indebtedness or liability * * * due or to become due, now existing or hereinafter arising." Further, Relpak gives Ever Ready an interest not only in the collateral covered by the sale, but in "any and all additions and accretions thereto." The language first quoted adds on debt other than the purchase price of the agreement involved in the specific sale; the language next quoted adds on additional collateral.

Gibraltar cites an impressive array of cases holding that add-on language of this character precludes a security interest from

satisfying the definition of a "purchase money security interest" in the Uniform Commercial Code.

NY UCC § 9–107 defines a "purchase money security interest" as follows:

"A security interest is a 'purchase money security interest' to the extent that it is:

"(a) taken or retained by the seller of the collateral to secure all or part of its price; * * *"

Gibraltar argues:

"The statute clearly requires a purchase money security interest to be solely in the item purchased and the collateral cannot secure any debt other than the purchase price. The overwhelming weight of the authority is such that where the collateral secures any debt other than its purchase price it is not a purchase money security interest under the Uniform Commercial Code even though the security agreements between the parties so provide. The purchase money security interest is destroyed.

"In re Krulik, 6 B.R. 443, 446 ( [Bkrtcy.] M.D.Tenn.1980); Roberts Furniture Co. v. Pierce, (In re Manuel), 507 F.2d 990 (5th Cir.1975); In re Trotter, 12 B.R. 72 ( [Bkrtcy.] C.D.Cal.1981); W.S. Badcock Co. v. Banks, (In re Norrell), 426 F.Supp. [435] (M.D.Ga.1977); In re Mulcahy, 3 B.R. 454 ( [Bkrtcy.] S.D.Ind.1980); In re Jackson, 9 UCC Rep. 1152 (W.D.Mo.1971); In re Simpson, 4 UCC Rep. 243 (W.D. Mich.1966); In re Jebbia, 9 B.R. 542 ( [Bkrtcy.] S.D.Ala.1980); In re Scott, 5 B.R. 37 ( [Bkrtcy.] M.D.Pa.1980); In re Brouse, 6 UCC Rep. 471 (W.D.Mich.1969); In re Booker, 9 B.R. 710 ( [Bkrtcy.] M.D. Ga.1981)." Pre-trial Memorandum of Law of Gibraltar Corporation of America, at 8.

The question is not as well-settled as Gibraltar suggests. With the exception only of In re Simpson, 4 U.C.C.Rep. 243 (W.D. Mich.1966),[3] all the cases on which it relies concern consumer goods and almost all involve a revolving credit plan under which new items are purchased and added on as collateral while old ones are paid off, while all remain under the same agreement.

The facts here are not the same. In this case, each sale gave rise to its own agreement and its own series of notes. Whatever the boilerplate on the standard printed form employed by Ever Ready, no claim is made that any agreement created a security interest in any collateral but the equipment that was the subject of the sale, or that such collateral secured any debt other than the purchase price, except as such claim can be read into the ambiguous language of paragraph 10 of the complaint which concerns a total figure of $3,355.60. As compared to a total debt of over $600,000, the figure of $3,355.60 is de minimis.

The concept that any "add-on" language wipes out purchase money priority has been strongly criticized by Dean (now District Judge) McLaughlin in an exhaustive analysis of the law. He argues forcefully "that despite some opposing case law, impermissible 'add on' clauses should not entirely destroy an equipment seller's purchase money status." McLaughlin, "Add-on Clauses in Equipment Purchase Money Financing: Too Much of a Good Thing," 49 Ford.L.Rev. 661, 664 (1981). He suggests that purchase money status may still be salvaged by dividing the security interest into two components or segments, part qualifying as a purchase money security interest, part not so qualifying. He finds the authority for such division in the fact that § 9–107(a) of the Uniform Commercial Code defines a security interest as being a purchase money security interest "to the extent" that it satisfies the conditions which follow.

---

**3.** In Simpson, where the bankruptcy court held that the security interest on farm equipment had been perfected by the creditor taking possession, what was said respecting failure to qualify as a purchase money security interest was dictum. In that case, the security agreement not only made the collateral security for the purchase price, but also for future indebtedness, and the purchaser had become indebted to the vendor on open account subsequent to the date of the security agreement, so that, as the court pointed out, it would have been possible for the purchase price to be paid off, but the security agreement to continue in effect as security for subsequent purchases or services rendered by the vendor.

Two recent cases have followed this view. *In re Gibson,* 16 B.R. 257, 264–69 (Bkrtcy.D. Kan.1981); *In re Coomer,* 8 B.R. 351, 353–54 (Bkrtcy.E.D.Tenn.1980).

Other courts have disregarded as immaterial the existence of unexercised add-on clauses. *In re Griffin,* 9 B.R. 880 (Bkrtcy.N. D.Ga.1981); *In re Mid-Atlantic Flange Co., Inc.,* 26 U.C.C. 203 (Bkrtcy.E.D.Pa.1979).

To deprive Ever Ready of the protection that the Uniform Commercial Code is designed to give a purchase money seller of equipment because the printed form it used contained boilerplate inconsistent with a pure purchase money security interest does not commend itself. What Ever Ready has is a purchase money security interest in the collateral which secures the purchase price, both principal and interest. To the extent that any of its agreements claim any more, there is no purchase money security interest with respect to such excess, be it debt or collateral.

For the foregoing reasons, it is concluded that Ever Ready has a purchase money security interest in all the equipment covered by the nine sales to Relpak. With respect to the equipment covered by Exhibit 6, its interest has priority over that of Gibraltar; with respect to all the other sales, Ever Ready's interest is subordinate to that of Gibraltar.[4]

### III.

■ One further point remains. Gibraltar claims that because its security interest exceeds the total value of Relpak's equipment, no value is left to which Ever Ready's interest can attach, making Ever Ready an unsecured creditor under 11 U.S.C. § 506. That section defines a "claim" to be "a secured claim to the extent of the value of such creditor's interest in such property * * * and * * * an unsecured claim to the extent that the value of such creditor's interest is less than the amount of such allowed claim." But Ever Ready's status under § 506 is outside the pleadings. Further-

more, Gibraltar's security interest extends to more than the equipment covered by Ever Ready's purchase money interests. Absent evidence of the value of that other collateral, it cannot be definitely stated to what extent Gibraltar's claim will have to be satisfied with the equipment covered by one of Ever Ready's security interests. Therefore, it is impossible to know as to any specific purchase money security interest to what extent it is secured, or unsecured.

For all these reasons, the Court will not hold at this time that Ever Ready's standing is not that of a secured creditor under § 506.

### IV.

■ Before concluding, reference should be made to the letter agreement to which Relpak and Gibraltar were parties, and to which Ever Ready subsequently subscribed, referring to a purchase money agreement to be entered into thereafter between Ever Ready and Relpak. The sole legal significance of that document appears to be that it put Gibraltar on notice that Ever Ready and Relpak intended to enter into a purchase money security agreement. Such notice is no substitute for filing. Accordingly, for purposes of the issues raised by this proceeding, the Court finds that document to be without any legal significance.

Since Relpak has offered no evidence that the equipment covered by Purchase Agreement 6 is necessary to an effective reorganization, or that adequate protection exists as to Ever Ready's interest in such equipment, the stay will be lifted as to such equipment. 11 U.S.C. § 362(d).

As for the balance, while this Court has indicated it will not hold that Ever Ready has no security interest in the machinery, the monetary value of its interest, in view of Gibraltar's prior claim, appears to be so debatable as to make unavailable the relief which Ever Ready seeks. There is no evidence that whatever monetary interest

---

4. Although the financing statement respecting Exhibit 4 was filed only in Albany, New York, UCC § 9–401(2) may cure that defect as re-

spects the debtor-in-possession. That issue is neither reached, nor decided, at this time.

Ever Ready may have is not adequately protected. Indeed, it may be to the advantage of Ever Ready for the debtor to remain in possession of such equipment, rather than have it sold to satisfy claims which are prior to that of Ever Ready.

Submit judgment.