**In the Matter of Eulas Harold HOOKS and Barbara T. Hooks, Debtors.**

**UNITED STATES of America, Plaintiff,**

**v.**

**Eulas H. HOOKS and Barbara T. Hooks, Madison Production Credit Association, and Dewitt Avery, Defendants.**

**Bankruptcy No. 81–50974–Mac.
Adv. No. 82–5348.**

United States Bankruptcy Court,
M.D. Georgia,
Macon Division.

May 25, 1984.

Lillian H. Lockary, Asst. U.S. Atty., Macon, Ga., for plaintiff.

Allan R. Roffman, Lambert & Roffman, Madison, Ga., for defendant Madison Production Credit Ass'n.

Jesse Copelan, Jr., Eatonton, Ga., for defendant Dewitt Avery.

## MEMORANDUM OPINION ON COMPLAINT TO DETERMINE LIEN PRIORITY

ROBERT F. HERSHNER, Jr., Bankruptcy Judge.

## STATEMENT OF THE CASE

On September 4, 1981, Eulas Harold Hooks and Barbara T. Hooks, Debtors, filed with the Court their petition under Chapter 7 of the United States Bankruptcy Code. On November 3, 1982, the United States of America, United States Department of Agriculture, Farmers Home Administration (FmHA), filed a "Complaint to Determine Lien Priority." Named as Defendants are the Madison Production Credit Association (PCA), Mr. Dewitt Avery, and Debtors. The complaint alleges that FmHA holds a security interest in certain cows, which is superior to the security interest of the PCA.

After reviewing the evidence and considering the briefs of counsel, the Court is of the opinion that the lien held by the PCA is entitled to priority. In support of its conclusion, the Court publishes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

Debtor Eulas Hooks operated two dairy farms located in Putnam County, Georgia. One farm was located on land owned by Mr. Rufus Waller and the other was located on land owned by Defendant Dewitt Avery. To finance his dairy on the Waller farm, Mr. Hooks executed a series of five promissory notes in favor of FmHA, each secured by a security agreement.[1] Mr. Hooks' five loans with FmHA can be summarized as follows:

| DATE OF LOAN | AMOUNT OF LOAN | DATE OF SECURITY AGREEMENT | LIVESTOCK COLLATERAL LISTED IN SECURITY AGREEMENT |
| --- | --- | --- | --- |
| 1–10–78 | $30,000.00 | 1–10–78 | 51 Cows and 4 Heifers |
| 6–02–78 | 20,000.00 | 5–10–78 | 42 Cows, 4 Heifers, and 2 Bulls |
| 2–12–79 | 30,000.00 | 2–12–79 | 66 Cows, 8 Heifers, and 1 Bull |
| 1–22–81 | 43,100.00 | 1–21–81 | 91 Cows, 3 Heifers, and 2 Bulls |
| 3–12–81 | 13,000.00 | 3–12–81 | 91 Cows, 3 Heifers, and 2 Bulls |

Each security agreement executed by Mr. Hooks in favor of FmHA contained an after-acquired property clause, which granted to FmHA a security interest in "[a]ll livestock ... now owned or hereafter acquired by Debtor, together with all in-

---

1. Although FmHA's security interest was not limited to livestock, the parties stipulate that this adversary proceeding involves only the livestock.

creases, replacements, substitutions, and additions thereto...." On January 10, 1978, the date of the first loan, FmHA filed a financing statement in the office of the Clerk of the Putnam County Superior Court, and on June 24, 1982, FmHA filed a continuation statement.

Mr. Terrell Boles, the FmHA county supervisor for Putnam County, testified that the loans to Mr. Hooks were for Mr. Hooks to purchase cows. When FmHA loaned the money to Mr. Hooks, the funds were placed in a supervised bank account. Both the signature of Mr. Hooks and the FmHA county supervisor were required for Mr. Hooks to withdraw the funds. Mr. Boles testified that the supervised account was maintained to ensure that the funds would be used for the purpose for which the loans were made. FmHA kept a record of deposits and withdrawals made from the account. The records reveal that the funds were used primarily for the purchase of cows. There were instances, however, in which the funds were used to purchase equipment, to pay expenses, and to satisfy another indebtedness of Mr. Hooks.

When purchasing cows, Mr. Hooks first purchased the cows and then presented the receipt to FmHA. FmHA then would disburse the funds from the supervised account. In all, Mr. Hooks purchased approximately ninety cows with FmHA's funds.

Mr. Boles testified that the cows purchased with FmHA's money were to be located on the Waller farm. Both FmHA and Mr. Hooks understood that the cows purchased with FmHA funds were to be located on the Waller farm.

On January 18, 1980, Mr. Hooks borrowed $111,700.00 from PCA and executed a promissory note to evidence the indebtedness. The loan proceeds were to be used by Mr. Hooks to purchase ninety-eight cows and two bulls from Mr. Avery for $100,000.00.[2]

Prior to the loan, on December 12, 1979, an appraisal report was made by PCA, which listed the ninety-eight cows and two bulls as owned by Mr. Hooks. Mr. John Richard Wilson, Jr., an agent of PCA, prepared the report, and he testified that the ninety-eight cows and two bulls actually were owed by Mr. Avery at the time of the report.

The ninety-eight cows and two bulls that Mr. Avery agreed to sell to Mr. Hooks were already encumbered by a security interest in favor of PCA. The agreement was that Mr. Hooks would borrow money from PCA and purchase the cows from Mr. Avery. Mr. Avery's indebtedness with PCA then would be paid. Mr. Hooks' promissory note with PCA was executed on January 18, 1980, and Mr. Avery was required to cosign the note with Mr. Hooks. Mr. Hooks and Mr. Avery granted to PCA a security interest in the cows and certain equipment. Also, on January 18, 1980, Mr. Avery executed a deed to secure debt on certain real estate in favor of PCA to further secure the debt. It was the agreement between Mr. Hooks and Mr. Avery that title to the cows would be transferred when the financing was completed.[3] PCA filed a financing statement on January 21, 1980, in the Clerk's office of the Putnam County Superior Court. On January 29, 1980, a check was given by PCA to Mr. Hooks in the amount of $100,081.30. Mr. Hooks endorsed the check to Mr. Avery, who used most of the funds to satisfy his indebtedness with PCA.

PCA conducted a lien search on Mr. Avery prior to the sale and found no liens on the cows other than the lien already held by PCA. PCA knew that Mr. Hooks had a dairy on the Waller farm, but understood that a new dairy was to be located on Mr.

---

**2.** Eleven thousand one hundred and seventy dollars was used for the purchase of stock in the PCA, $344.70 was used to pay a service charge, and $104.00 was used to pay credit life insurance. Mr. Hooks received a net check of $100,-081.30 on January 29, 1980.

**3.** Mr. Hooks took care of the cows for several weeks prior to January 18, 1980, for the purpose of milking and inspecting the cows.

Avery's farm, which was to be separate from the Waller farm dairy.

When FmHA loaned money to Mr. Hooks subsequent to Mr. Hooks' loan from PCA, FmHA conducted a lien search. A lien search dated January 9, 1981, revealed that on January 21, 1980, PCA filed a financing statement, listing "cows etc" as collateral. On his July 9, 1981, loan application with FmHA, Mr. Hooks shows PCA as holding a lien on chattels. Mr. Boles testified that he did not look into PCA's liens or contact PCA since he assumed that FmHA had a first lien on the cows on the Waller farm.

For some time, Mr. Hooks maintained the separate dairies, with the FmHA cows on the Waller farm and the PCA cows on the Avery farm.

Mr. Hooks had difficulty operating the two separate dairies. As a result, he moved the cows in which PCA held a security interest to the Waller farm. On the Waller farm, the PCA cows were mixed with approximately forty-eight to fifty cows in which FmHA held a security interest. PCA was not aware of the move until the 341(a) meeting of creditors held in October of 1981.[4] Mr. Boles of FmHA knew of the move and knew that some of the cows on the Waller farm were the PCA's security. Mr. Boles talked to Mr. Hooks about branding the FmHA cows to protect FmHA's security, but the branding never took place.

During the summer of 1981, Mr. Hooks was experiencing financial difficulties, and he was not able to feed his cows. Since the cows were not being fed, they tore down fences, crossed the highway, and entered a neighbor's land. The testimony is that the cows were starving, and the situation was termed an emergency.

The evidence is that FmHA offered to care for the cows. A representative of FmHA testified that FmHA offered to allow Mr. Hooks to care for the cows out of a supervised bank account. Mr. Hooks, however, did not agree to the use of the super-vised account, and no agreement was reached between Mr. Hooks and FmHA.

Mr. Hooks then informed Mr. Avery that he was contemplating filing a bankruptcy petition. Mr. Hooks stated that the cows belonged to Mr. Avery and that he should feed them. The sheriff's department had often requested that Mr. Avery remove the cows from the highway. The fences at the Waller farm were broken, the electric service had been terminated, the milking equipment was in disrepair, and there were no facilities to properly care for the cows at the Waller farm. Therefore, on September 24, 1981, (after Mr. Hooks' petition in bankruptcy), Mr. Avery moved the cows to another farm known as the Owens-Edwards-Schell farm. The parties stipulate that fifty cows were moved by Mr. Avery. At the time of the move, the cows had practically starved and were of very little value. Testimony indicates that the cows were worth from $200.00 to $300.00 at the time of the move.

After Mr. Avery moved the cows, he assumed the promissory note of Mr. Hooks, repledged the cows, and granted to PCA a lien on his home and farm. Mr. Avery later moved the cows from the Owens-Edwards-Schell farm to his farm. The cows gave little milk and did not produce enough to cover the cost of feeding them. Although Mr. Avery sold some milk from the cows to Sealtest Dairies, he testified that it cost him between $35,000.00 and $40,000.00 to feed the cows. There were additional expenses for veterinary care and electricity. Eleven of the cows died and all but two were sold by Mr. Avery.

On October 14, 1981, the trustee of Mr. Hooks' bankruptcy estate abandoned any claim Mr. Hooks' bankruptcy estate had to the cows.

It is the testimony of Mr. Hooks and Mr. Avery that the cows that were moved on September 24, 1981, were all a part of the cows that Mr. Avery sold to Mr. Hooks on January 18, 1980. The FmHA cows either died or were sold prior to the move. Mr.

---

4.  11 U.S.C.A. § 341(a) (West 1979).

Hooks and Mr. Avery testified that they could identify the cows because they had observed the cows for some time, and because approximately forty to fifty percent of the cows had the ear tags that Mr. Avery had previously placed on the cows. Two other dairymen testified that it was common for a dairyman to be able to distinguish his cows. The Court concludes that the cows that were moved on September 24, 1981, were all a part of the cows purchased by Mr. Hooks from Mr. Avery with PCA funds on January 18, 1980.

## CONCLUSIONS OF LAW

FmHA argues that it is entitled to priority over the lien of PCA, and requests that the Court award to FmHA the value of the fifty cows on the date they were moved by Mr. Avery.[5] Mr. Avery and PCA claim that PCA's lien on the cows is entitled to priority.

■ Questions concerning the priority of liens are resolved through the application of state law. *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979); *Roberts Furniture Co. v. Pierce (In re Manuel)*, 507 F.2d 990 (5th Cir.1975). For purposes of this adversary proceeding, the relevant priority statutes are found in O.C.G.A. § 11–9–312(4), (5)(a), (7) (Michie 1982), which provide:

(4) A purchase money security interest in collateral other than inventory has priority over a conflicting security interest in the same collateral or its proceeds if the purchase money security interest is perfected at the time the debtor receives possession of the collateral or within 15 days thereafter.

(5) In all cases not governed by other rules stated in this Code section (including cases of purchase money security

interests which do not qualify for the special priorities set forth in subsections (3) and (4) of this Code section), priority between conflicting security interests in the same collateral shall be determined according to the following rules:

(a) Conflicting security interests rank according to priority in time of filing or perfection. Priority dates from the time a filing is first made covering the collateral or the time the security interest is first perfected, whichever is earlier, provided that there is no period thereafter when there is neither filing nor perfection.

. . . .

(7) If future advances are made while a security interest is perfected by filing or the taking of possession, the security interest has the same priority for the purposes of subsection (5) of this Code section with respect to the future advances as it does with respect to the first advance. If a commitment is made before or while the security interest is so perfected, the security interest has the same priority with respect to advances made pursuant thereto. In other cases a perfected security interest has priority from the date the advance is made.

The evidence reveals that Mr. Hooks executed five promissory notes in favor of FmHA and executed five security agreements. The security agreements granted to FmHA a security interest in "[a]ll livestock ... now owned or hereafter acquired by Debtor." FmHA filed a financing statement on January 10, 1978. PCA filed its financing statement on January 21, 1980. Therefore, PCA's lien is entitled to priority over FmHA's lien only if PCA has a perfected purchase-money security interest in the cows moved on September 24, 1981.[6]

---

**5.** FmHA requests the value of the cows on the date they were moved, September 24, 1981, because all but two of the fifty cows either died or were sold by Mr. Avery.

**6.** The cows in question are farm products. O.C.G.A. § 11–9–109(3) (Michie 1982). A security interest in farm products is perfected by filing. O.C.G.A. § 11–9–302 (Michie 1982). Thus, unless PCA has a perfected purchase-money securi-

ty interest in the cows, FmHA will prevail. The Court need not address whether FmHA held a purchase-money security interest in the cows purchased by Mr. Hooks with its funds. As noted earlier, the Court is of the opinion that the cows moved on September 24, 1981, were cows purchased with PCA money. Thus, the only issue is whether PCA held a perfected purchase-money security interest so as to defeat

A purchase-money security interest is defined in O.C.G.A. § 11–9–107 (Michie 1982). That section provides:

A security interest is a "purchase money security interest" to the extent that it is:

(a) Taken or retained by the seller of the collateral to secure all or part of its price; or

(b) Taken by a person who by making advances or incurring an obligation gives value to enable the debtor to acquire rights in or the use of collateral if such value is in fact so used.

The evidence is that on January 18, 1980, Mr. Hooks and Mr. Avery executed a promissory note with PCA. On the same date, Mr. Hooks and Mr. Avery executed a security agreement and financing statement. After the promissory note and security agreement were executed, legal ownership of the cows was transferred to Mr. Hooks. PCA furnished all of the money for the purchase in a check to Mr. Hooks dated January 29, 1980. Mr. Hooks then endorsed the check to Mr. Avery.

■ FmHA first argues that PCA is not a "seller" of collateral and therefore cannot hold a purchase-money security interest in the cows. The Court cannot agree. Under Georgia law, it is settled that a lender may acquire a purchase-money security interest in collateral although it does not actually sell the collateral. *See, e.g., Continental Oil Co. v. Sutton,* 126 Ga.App. 78, 189 S.E.2d 925 (1972).

■ FmHA also argues that the January 1980 loan did not "enable the debtor to acquire rights in or the use of collateral," and that the funds were not "in fact so used." The evidence reveals that Mr. Hooks took care of the cows several weeks before the January 18, 1980, loan from PCA. However, it is the uncontradicted testimony that Mr. Hooks took care of the cows for the purpose of inspecting and milking the cows so that he could be sure that he wanted to purchase them. The evidence reveals that title to the cows was not transferred to Mr. Hooks until the loan was closed.

FmHA also points to the fact that an appraisal report of Mr. Hooks' property, dated December 12, 1979, shows that Mr. Hooks owned the ninety-eight cows and two bulls. FmHA further stresses that the security agreement dated January 18, 1980, signed by Mr. Hooks represents that Mr. Hooks owned the cows before the loan proceeds were disbursed on January 29, 1980.

The evidence reveals that Mr. Wilson, a loan officer with PCA, prepared and signed the appraiser's report. Mr. Wilson testified that he made the appraisal of collateral based on what Mr. Hooks owned and what Mr. Hooks would be acquiring. The Court also is convinced that Mr. Hooks' representation in the security agreement is of a fact that had been agreed on and which was about to occur. The Court is persuaded by the testimony of Mr. Hooks and Mr. Avery that legal ownership in the cows was not transferred until the loan with PCA was closed.

Finally, the Court notes that the money was disbursed on January 29, 1980, while legal ownership passed after the promissory note and security agreement were executed on January 18, 1980. In *North Platte State Bank v. Production Credit Association,* 189 Neb. 44, 200 N.W.2d 1, 10 U.C.C.Rep.Serv. 1336 (1972), a farmer purchased cows on account and took title and possession of the cows. Two months later the farmer obtained a loan from the bank and used the proceeds to pay for the cows. At the time of the loan, the bank took a security interest in the cows. The court held that the bank's security interest was not a purchase-money security interest because the loan proceeds were not used to enable the farmer to acquire rights in the collateral. The court reasoned that since the farmer already had possession and title, he already had all the rights he could possibly acquire in the collateral through the use of the bank's money.

FmHA's security interest in after-acquired property.

In B. Clark, The Law of Secured Transactions Under the Uniform Commercial Code § 3.9[2] (1980), the author explains the *North Platt* decision:

> The court felt that the advance merely enabled the debtor to pay a debt. However, if facts can be developed that show a closer nexus between the original open account sale and the later bank financing, the bank would have a stronger argument. If Supplier in the example above had contemplated bank financing as necessary to "take out" the open account, Bank should be given purchase money priority. The test should be whether the availability of a direct loan take-out was a factor in negotiating the original sale. The fact that the transaction required two steps should not be fatal, so long as both steps were contemplated as part of a single financing arrangement.

One of the drafters of the Uniform Commercial Code also has suggested that a lender could acquire a purchase-money security interest although the borrower first acquires the goods and then makes payment with the borrower's funds: "If the loan transaction appears to be closely allied to the purchase transaction, that should suffice. The evident intent of paragraph (b) is to free the purchase-money concept from artificial limitations; rigid adherence to particular formalities and sequences should not be required." 2 G. Gilmore, Security Interests in Personal Property 782 (1965).

In light of the above, the Court is of the opinion that *North Platte* is distinguishable from the instant adversary proceeding. In *North Platte*, the borrower acquired the goods on open account, and two months later borrowed the money to pay the debt. In this adversary proceeding, the parties intended that the sale of the cows would not be consummated until the loan closed. It was only after the loan was approved and closed that title passed and the loan

proceeds were disbursed. The loan and its disbursement thus are closely allied to the sale. The Court is of the opinion that rigid rules of sequence should not be followed, but that an inquiry should be made to determine the relationship of the transactions. In this adversary proceeding, the Court is convinced that PCA obtained a purchase-money security interest in the cows sold by Mr. Avery to Mr. Hooks on January 18, 1980.

■ Under section 11–9–312(4), PCA's purchase-money security interest will have priority over FmHA's security interest only if "the purchase money security interest is perfected at the time the debtor receives possession of the collateral or within 15 days thereafter." Since PCA's purchase-money security interest in the cows is a security interest in farm products,[7] the purchase-money security interest of PCA could only be perfected by filing. O.C.G.A. § 11–9–302 (Michie 1982). The Court thus must determine whether PCA's filing on January 21, 1980, occurred within fifteen days of Mr. Hooks' taking possession of the cows.

In *National Acceptance Co. v. Community Bank (In re Ultra Precision Industries, Inc.)*, 503 F.2d 414 (9th Cir.1974), the buyer received a shipment of goods on approval. Thereafter, the buyer entered into a sales contract and executed a security agreement on the goods. The court found that the buyer took possession, for purposes of U.C.C. § 9–312(4), at the time of the decision to buy, rather than at the time that technical possession of the goods was taken. The court reasoned that the buyer did not become a "debtor," as defined by U.C.C. § 9–105(1)(d), until the buyer decided to purchase the goods and executed the security agreement. *Accord Brodie Hotel Supply, Inc. v. United States*, 431 F.2d 1316 (9th Cir.1970); *Commerce Union Bank v. John Deere Industrial Equipment Co.*, 387 So.2d 787 (Ala. 1980).[8]

---

7.  *See* O.C.G.A. § 11–9–109(3) (Michie 1982).

8.  The Court has considered those cases which hold that for purposes of U.C.C. § 9–312(4), a debtor takes possession upon actual delivery of

Although Mr. Hooks took care of the cows for "several weeks" prior to the January 18, 1980, loan, the uncontroverted testimony is that Mr. Hooks milked and cared for the cows only for the purpose of determining whether he wanted to buy them. The cows belonged to Mr. Avery, and presumably they were located on his farm. From the evidence, the Court concludes that Mr. Hooks' decision to purchase Mr. Avery's cows was not made until Mr. Hooks obtained the PCA loan, and that Mr. Hooks did not therefore become a "debtor," for purposes of O.C.G.A. § 11–9–105(1)(d) (Michie 1982), under a binding contract until that time.[9] It was only then that Mr. Hooks had some actual possessory interest in the cows, which could trigger section 11–9–105(1)(d). Since Mr. Hooks took possession, for purposes of section 11–9–312(4), on January 18, 1980, the date the PCA loan was closed, and PCA's financing statement was filed on January 21, 1980, PCA's purchase-money security interest is properly perfected, and PCA's perfected purchase-money security interest has priority over FmHA's lien under section 11–9–312(4).

■ FmHA argues that if PCA's lien is superior, PCA's lien should be subordinated under 11 U.S.C.A. § 510(c) (West 1979). That section provides:

(c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or

(2) order than any lien securing such a subordinated claim be transferred to the estate.

In *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692 (5th Cir.1977), the United States Court of Appeals for the former Fifth Circuit held that equitable subordination is proper only upon a showing that three conditions are satisfied:

(i) The claimant must have engaged in some type of inequitable conduct.

(ii) The misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant.

(iii) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act.

*Id.* at 699–700 (citations omitted). *See also Katz v. Department of Justice (In re Bellucci)*, 29 B.R. 814, 10 Bankr.Ct.Dec. 721 (Bkrtcy.App. 1st Cir.1983); *Nicholson v. Core (In re Carolee's, Inc.)*, 3 B.R. 324 (Bkrtcy.N.D.Ga.1980).

Also, in *Machinery Rental, Inc. v. Herpel (In re Multiponics, Inc.)*, 622 F.2d 709 (5th Cir.1980), the court noted the standards set out in *In re Mobil Steel Co.*, and noted that bankruptcy courts have the equitable power "to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in the administration of the bankruptcy estate." *Id.* at 714 (quoting *Pepper v. Litton*, 308 U.S. 295, 308, 60 S.Ct. 238, 246, 84 L.Ed. 281 (1939)). It has been held that equitable subordination is conditioned upon the premise that "a claimant [must] do equity before receiving equity in the proceeding." *Central States Corp. v. Luther (In re Garden Grain & Seed Co., Inc.)*, 215 F.2d 38, 46 (10th Cir. 1954), *cert. denied*, 348 U.S. 951, 75 S.Ct. 438, 99 L.Ed. 743 (1955). *See also* 3 Collier on Bankruptcy ¶ 510.05 (15th ed. 1984).

---

the goods. *See, e.g., Ever Ready Machinists, Inc. v. Relpak Corp. (In re Relpak Corp.)*, 25 B.R. 148 (Bkrtcy.E.D.N.Y.1982). The Court has found no decisions binding upon it, and chooses to follow the apparent majority approach taken in *In re Ultra Precision Industries, Inc.*

**9.** O.C.G.A. § 11–9–105(1)(d) (Michie 1982) defines "debtor" as "the person who owes payment or other performance of the obligation secured ...." Mr. Hooks was not obligated to make payment or other performance until Mr. Hooks obtained the PCA loan. Mr. Hooks and Mr. Avery agreed that title would not pass until the financing was completed.

FmHA argues that the lien of PCA should be subordinated on several grounds. First, FmHA notes that PCA "condoned the clandestine transfer of FmHA's secured property." FmHA further argues that PCA accepted the cows as collateral for a new loan to Mr. Avery. The evidence, however, shows that PCA was not aware of any dispute over the lien priorities until the 341(a) meeting of creditors held in October of 1981. The evidence also reveals that FmHA was aware of the cows being moved to the Waller farm, and was aware that a problem of identification of collateral might result. A representative of FmHA talked of branding the cows to protect its security, but this was never done.

FmHA also argues that Mr. Avery milked the cows in question, and used the proceeds to reduce his indebtedness with PCA. The Court, however, notes that PCA's purchase-money security interest in those cows was superior to the lien of FmHA. Furthermore, the evidence reveals that it cost Mr. Avery more to feed and care for the cows than they produced in milk. In short, the Court finds that the equities of the case do not warrant the subordination of PCA's lien.

An order in accordance with this opinion is attached hereto.