In the Matter of GALBREATH CLEAR-
ING AND GRADING, INC. d/b/a Gal-
breath, Inc., Debtor.

The Coastal Bank, Plaintiff,

v.

Douglas Asphalt Company, Caterpillar
Financial Services Corporation, Track
and Tire, Inc., Case Credit Corpora-
tion, United States of America, and
James B. Wessinger, III, Chapter 7
Trustee, Defendants.

Bankruptcy No. 99–41784.
Adversary No. 99–4161.

United States Bankruptcy Court,
S.D. Georgia,
Savannah Division.

Dec. 1, 2000.

W. Brooks Stillwell, III, Savannah, Georgia, for Movant.

R. Kenny Stone, Statesboro, Georgia, for Debtor.

James B. Wessinger, III, Savannah, Georgia, for trustee.

## ORDER ON MOTION FOR SUMMARY JUDGMENT

LAMAR W. DAVIS, Jr., Bankruptcy Judge.

Coastal Bank sued the named Defendants in this case seeking a determination of the extent, validity, and priority of its floating lien in all the equipment of the Debtor corporation. Defendant, Case Credit Corporation ("Case"), filed a Motion for Summary Judgment seeking a determination that its purchase money security interest in certain collateral is superior to the competing general lien on equipment held by The Coastal Bank ("Coastal") and any interest of the co-defendants. The parties stipulated numerous facts which are attached as Exhibit "A" and incorporated in this Order by reference. To summarize and supplement those findings as they ultimately are relevant to this Court's determination of the Motion for Summary Judgment, the Court makes the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

Coastal Bank holds a security interest in all equipment of Galbreath Clearing and Grading, Inc., ("GC & G") by virtue of a note, security agreement, and UCC–1 financing statement which date back to August 1994 (*See* Exhibits P–1, P–2, P–3 and P–4). The parties stipulate that these documents constitute a perfected security interest in favor of Coastal Bank in all the equipment of GC & G. Case's claim to a first priority, purchase money security interest derives from a transaction which occurred in October of 1998. On October 16, 1998, Track and Tire, Inc., ("T & T"), executed a retail installment contract and security agreement conveying to GC & G,

five pieces of equipment. GC & G granted a security interest in that collateral to T & T. This retail installment contract was subsequently assigned to Case (Exhibit D–1). On October 26, 1998, the security agreement between the parties was perfected by the filing for record of a UCC–1 financing statement (Exhibit D–2).

This transaction, standing alone, presents all of the elements required by Georgia law for Case to have acquired a fully perfected purchase money security interest in this collateral. Coastal, however, contends that the October 1998 transaction between GC & G and T & T provides Case with only a non-purchase money security interest which is inferior to the security interest held by Coastal. This results because of an earlier lease agreement between T & T and a differently-named entity, Galbreath Trucking Company/Galbreath, Inc. ("GTC/GI") which was executed on or about February 25, 1998 (Exhibit P–10).

The February 25, 1998, Equipment Lease Agreement provides, in relevant part as follows:

> We, Track & Tire, Inc., agree to lease to You Galbreath Trucking Co., Inc./Galbreath, Inc. . . . the Equipment listed below. . . .
>
> [payments] $9,000.00 month for 5 months to Track & Tire, Inc. Rental automatically converts Irrevocably (sic) Guaranteed by John Douglas Galbreath, Galbreath, Inc. Galbreath Trucking Co., Inc. Financing to be provided by Case Credit Company. Total Price on conversion is $435,000.00 at conversion on 6th month. Deal is subject to finance approval by lender. Galbreath to provide proper assistance in Dilligence (sic) paperwork. Financing on conversion to be no more than 1.5% over prime at time of conversion or Better, if possible.
>
> 1. TERM AND RENT: The Term of this Lease will consist of the Initial Term with no extensions. The Initial

Term of this lease will begin upon Financing approval and disbursement of funds, and will end 5 months thereafter. At which time deal will automatically convert to Term Financing, as agreed. You may not extend the Term of this agreement ....

8. END OF LEASE OPTIONS: See terms of contract. CONTRACT IRREVOCABLY CONVERTS TO TERM FINANCE DEAL AT 6TH MONTH, GUARANTEED BY JOHN DOUGLAS GALBREATH, GALBREATH, INC. GALBREATH TRUCKING CO. INC. AND IS RENTED AND SOLD, ON AN "AS IS, WHERE IS" BASIS WITHOUT RECOURSE TO, OR WARRANTY BY, LESSOR OF ANY KIND, NATURE OR DESCRIPTION WHATSOEVER....

10. MISCELLANEOUS: (a) The Equipment is and throughout the Term will be only Our property, and neither You nor anyone else will acquire an interest in the Equipment whatsoever by reason of this Lease, except Your right to possess and use it as a lessee subject to the terms and conditions of this Lease Agreement. YOU AGREE NOT TO ASSIGN OR ATTEMPT TO ASSIGN ANY INTEREST IN THE EQUIPMENT OR THIS LEASE AND ANY SUCH ASSIGNMENT OR ATTEMPT TO ASSIGN WILL BE A DEFAULT ...

The equipment leased in February of 1998 included the same five pieces of equipment financed in October of 1998, plus three other pieces of equipment which T & T repossessed and Debtor no longer owns or uses. (Estes Dep. pp. 27, 63). The February lease called for $9,000.00 monthly payments and an automatic conversion of the lease to permanent long-term financing at the end of the term. The conversion feature was stated to be "irrevocable" but financing was to be provided, not by the lessor T & T, but rather by Case Credit Corporation. The long term financing was expressly stated to be subject to credit approval by Case. The lease provided that the lessee had no property interest in the collateral other than a possessory right, and appears to be a true lease. However, either out of an abundance of caution, or because T & T believed its transaction to be subject to interpretation as a conditional sale, it filed a UCC financing statement. Unfortunately for Case, that financing statement was filed one day later than the deadline which would have afforded T & T a perfected purchase money security interest superior to Coastal's prior lien. As a result, Coastal's interest will defeat any Case interest which originated with the February 1998 lease.

In order to defeat Case Credit Corporation's claim to a first perfected security interest arising out of the October 1998 transaction, Coastal Bank must show that the lease transaction in February of 1998 was a conditional sale rather than a true lease, that it was not timely perfected, and that Galbreath, Inc., one of the co-lessees in that transaction, is simply a fictitious trade name under which the debtor Galbreath Clearing and Grading, Inc., did business. If all that is established at trial, then the February 1998 lease was not between T & T and separate but related parties, but was actually a conditional sale with GC & G that was not timely perfected, and the perfection by filing of the financing statement in October on which Case now relies did not occur within 15 days of the date that GC & G obtained possession in February.

Case contends that, as a matter of law, this Court can grant summary judgment through two separate and distinct theories: (1) the lease between T & T and GTC/GI was not a lease which was in any way an obligation of Galbreath Clearing and Grading, Inc., and (2) even if there is a question of fact as to the identity of GC & G and GTC/GI, Case's purchase money security interest was, in fact, perfected within 15 days of the time that GC & G obtained possession and rights in the collateral in

October under the retail installment contract, and that GC & G's prior possession as lessee under the February lease does not defeat the timeliness of the October filing date.

I have concluded that there is a genuine issue of material fact as to whether Galbreath, Inc., and Galbreath Clearing and Grading, Inc., were, in fact, the same entity and that matter can only be resolved at trial. Case correctly points out that the lessee on the February lease (Exhibit P–10) was not GC & G, but rather was GTC/GI. Case argues that the identification of GTC/GI as lessee was intended by the parties to indicate that Galbreath, Inc., was the alter ego of Galbreath Trucking Company, not GC & G. In fact, the equipment which was the subject of that lease had at one time been owned by Galbreath Trucking Company, was then sold to T & T, and then later was leased by T & T back to GTC/GI.

Case's argument that GTC/GI is not the same entity as GC & G is powerful. However, Mr. Galbreath testified that at times he used Galbreath, Inc., as a trade name for GC & G while at other times using it as a trade name for GTC. The evidence is also clear that the payments to T & T under the lease between February and October of 1998 were made by GC & G and that GC & G utilized the equipment in its business during that period of time. In addition, the Federal tax identification number on the February contract belonged to GC & G, not GTC. Case's response is that the evidence also reveals that the pattern of business operation between the Galbreath entities consisted of GTC/GI owning equipment and leasing it to GC & G. GC & G then used the equipment in its daily business and wrote checks to cover the applicable lease or finance payments.

Clearly, Case might prevail after a full evidentiary hearing when all evidence may be taken, factual issues resolved, and the matter decided by a preponderance of the evidence. However, I conclude that there is a genuine issue of material fact on this point and that summary judgment is not authorized.

Nevertheless, I hold that even assuming the original lessee, GTC/GI is to be construed to be GTC/GC & G, the lease transaction in February 1998 was not a conditional sale. Rather it was a true lease which was terminated at some point prior to October 13, 1998, and the new financing arrangement between T & T, GC & G, and Case constitutes a valid purchase money security transaction.

## CONCLUSIONS OF LAW

This Court, in accord with Federal Rule of Civil Procedure 56(c), applicable through Federal Rule of Bankruptcy Procedure 7056, may grant summary judgment only if "there is no general issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is material if it might affect the outcome of a proceeding under the governing substantive law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The moving party has the burden of establishing its right to summary judgment, and the court will read the opposing party's pleadings liberally. *See Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir.1991); *Clark v. Union Mut. Life Ins. Co.,* 692 F.2d 1370, 1372 (11th Cir.1982); *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510–11.

To determine if there is a genuine issue of material fact, the Court must view the evidence in the light most favorable to the party opposing the motion. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Rosen v. Biscayne Yacht and Country Club, Inc.,* 766 F.2d 482, 484 (11th Cir.1985). After a *prima facie* showing that the moving party is entitled to judgment as a matter of law, the party opposing the motion must go beyond the pleadings and demonstrate that there is a material issue of fact which

precludes summary judgment. *See Martin v. Commercial Union Ins. Co.*, 935 F.2d 235, 238 (11th Cir.1991).

I. *The February 28, 1998, lease was a true lease and not a conditional sale.*

■ The Uniform Commercial Code provides that the facts of each case determine whether a transaction creates a lease or a security interest. O.C.G.A. § 11–1–201(37) provides in relevant part as follows:

> (37) "Security interest" means an interest in personal property or fixtures which secures payment or performance of an obligation. . . .

Whether a transaction creates a lease or security interest is determined by the facts of each case; however, a transaction creates a security interest if the consideration the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease not subject to termination by the lessee, and

(a) The original term of the lease is equal to or greater than the remaining economic life of the goods,

(b) The lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods,

(c) The lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement, or

(d) The lessee has an option to become the owner of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement.

The facts of this case clearly establish that the February lease does not meet any of these requirements so as to be construed as a conditional sale. The term of the lease was five months which was substantially less than the remaining economic life of the Caterpillar equipment. (Estes Dep. p. 48–49). The lessee was not obligated to renew or extend the lease beyond the five month lease term (Estes Dep. p.49). In fact, the lessee had no right to extend the lease beyond the five month lease term. (Estes Dep. p.49). The lessee also had no obligation to become the owner of the Caterpillar equipment at the end of the lease term. (Estes Dep. p. 35) and could either surrender the Caterpillar equipment at the end of the lease term or buy it. (Estes Dep. p. 34–35). Lessee had an option to become the owner of the leased equipment by paying the sum of $435,000.00 to T & T at the end of the lease term (Estes Dep. p. 50), which is obviously more than a nominal consideration. While it is true that the lease "irrevocably" converted to a financing arrangement at the end of the five month lease, that financing was not guaranteed. According to the terms of the lease, T & T had no obligation to finance the deal, and the financing was "subject to finance approval" by Case. Because the financing was contingent, had not been preapproved, and was never approved on the terms stated in the February lease I conclude that GTC/GI never became "bound" to become owner of the goods. (Estes Dep. pp. 36, 43, 56).

Moreover, paragraph 10 of the lease provides:

> (a) The Equipment is and throughout the Term will be only Our (T & T's) property, and neither You (lessee) nor anyone else will acquire an interest in the Equipment whatsoever by reason of this Lease, except Your right to possess and use it as a lessee subject to the terms and conditions of this Lease Agreement. . . .

(Exhibit P–10).

If the financing was not approved, GTC/GI had no residual lease rights. It could pay $435,000.00 to T & T in cash, or surrender the equipment. It had no right to extend the term of the agreement and upon default in the payment of $435,000.00,

T & T had the immediate right to repossess.

Therefore, neither GTC/GI (or for the purposes of this motion GC & G) acquired any ownership interest in the Caterpillar equipment as a result of the lease. As a result, Coastal Bank's pre-existing blanket security interest in the equipment of GC & G did not attach to the Caterpillar equipment at any time during the term of the lease. Moreover, since the transaction was a true lease, T & T was not required to file a financing statement in order to preserve its property interests in the equipment vis-a-vis Coastal during the lease term.

Coastal apparently contends that the lease term should be viewed not as encompassing only the five month period, but rather the long-term financing period contemplated in the lease agreement. However, because that financing had not been prearranged, had not been approved by Case Credit Corporation, was not required to be extended by T & T in lieu of financing by Case Credit, and because the subsequent Case financing transaction was made on different terms, I hold that, for the purposes of applying this Code Section, the lease term is limited to the stated period of five months. *See* O.C.G.A. § 13–3–4 ("A condition precedent must be performed before the contract becomes absolute and obligatory upon the other party."); *Parker v. Averett,* 114 Ga.App. 401, 151 S.E.2d 475 (1966) (holding provision in contract requiring that sale of land be contingent on FHA financing to be a condition precedent to contract for sale and citing *Scarborough v. Novak,* 92 Ga.App. 488, 88 S.E.2d 800 (1955) for the proposition that terms and conditions of loans must be specific enough to be enforceable); *First National Bank of Cobb County v. Atlanta Classic Cars, Inc.,* 184 Ga.App. 784, 363 S.E.2d 16 (1987)(stating that the essential distinction between a lease and a conditional sale is that a lessee never owns the property); *Grier v. Brogdon,* 234 Ga. App. 79, 505 S.E.2d 512 (1998)(finding debtor's duty to obtain financing a condition precedent to a contract for the sale of land).

Having concluded that the February lease was not a conditional sale which, because it was not timely perfected would relegate Case to an inferior lien position to that of Coastal, it is necessary to determine whether the security interest obtained by Case in October was timely perfected as against Coastal and the other Defendants.

II. *Case Credit holds a timely perfected purchase money security interest which is superior to any interest of Coastal Bank.*

The competing security interests held by Coastal and Case Credit are governed by O.C.G.A. § 11–9–312(4) which provides as follows:

(4) A purchase money security interest in collateral other than inventory has priority over a conflicting security interest in the same collateral or its proceeds if the purchase money security interest is perfected at the time the debtor receives possession of the collateral or within 15 days thereafter.

If Case cannot prove that its interest in the collateral meets the requirements of this Code section, then the earlier filed floating lien over equipment of the Debtor held by Coastal, or junior liens of other defendants, will be deemed superior. To prevail, Case must show that it (1) holds a purchase money security interest and (2) that interest was perfected within 15 days after the Debtor received possession of the collateral. "Purchase money security interest" is defined by O.C.G.A. § 11–9–107 as:

A security interest is a "purchase money security interest" to the extent that it is:

(a) Taken or retained by the seller of the collateral to secure all or part of its price; or

(b) Taken by a person who by making advances or incurring an obligation gives value to enable the debtor to acquire rights in or the use of collateral if such value is in fact so used.

Under the retail installment contract and security agreement (Exhibit D–1), T & T retained a security interest to secure the purchase price of the collateral. Its assignee, Case Credit, advanced $300,000.00 to T & T which enabled the Debtor, GC & G, to acquire rights in the collateral. The contract was dated October 16 and the financing statement which evidenced the existence of a lien in the goods was recorded October 26, 1998, within 15 days of the execution of the documents. Thus, I find that Case holds a purchase money security interest in the collateral, which was timely perfected.

■ Coastal contends that there is no purchase money security interest in the October transaction because Case merely refinanced the earlier February lease obligation, precluding any opportunity to create a purchase money security interest, under Georgia law, in the October transaction. Coastal contends that "there can be only one chance to create a purchase money security interest, when the debtor first finances the acquisition of rights in the collateral." *See* Plaintiff's Supplemental Brief, p. 17. Coastal argues that Case lost its one and only chance to create a purchase money security interest in the Caterpillar equipment when it failed to do so in February, the time of the first transaction.

Black's Law Dictionary defines "refinance" as "To finance again or anew; to pay off existing debts with funds secured from new debt. The discharge of an obligation with funds acquired through the creation of a new debt." Here, the February lease, between T & T and GTC/GI was a true lease, containing an unconsummated purchase option, which expired sometime prior to the October transaction between GC & G and T & T. At the time of the October transaction, then, no debt or obligation existed between T & T and GC & G. When Case advanced $300,000.00, it neither "paid off" nor "financed anew" any then "existing debt."

The October contract further lacks any characteristics of a refinanced credit arrangement between the parties to the original lease. It is instead a new and distinct credit arrangement between Case Credit and GC & G. There are several distinctions between the February and October transactions. The rental payments paid to T & T under the February contract were provided by GTC/GI while in the October transaction, the funds advanced to T & T for purchase were solely those of Case. The terms of the financing extended by Case differed as to the subject matter (five pieces of equipment versus eight pieces), amount ($300,000.00 vs. $435,000.00), term (40 months vs. unstated), and interest rate (11.9 vs. 1.5 above prime) from that contemplated in the earlier transaction.

Coastal cites the case of *Franklin v. ITT Financial Services*, 75 B.R. 268 (Bankr.M.D.Ga.1986) in support of its argument. In *Franklin*, the collateral was purchased with a small down payment and a balance due in ninety (90) days of $1,600.00 with seller retaining a security interest. The security agreement was assigned to ITT before the end of the 90 days. When the Debtor failed to pay the balance in full at the end of 90 days, ITT loaned her a total of $3,000.00 to pay off the balance due and advanced new money. The collateral was again pledged to secure the loan along with a color television, a video disc, and a camera. The court held that the refinancing by the holder of the old note extinguished the purchase money nature of the security interest since the Debtor had already purchased the wall unit. *Id.* at 271. *Franklin* is distinguishable because no existing debt payable to Case was refinanced by Case and no existing purchase money security interest existed between T & T and GC & G. *See also In re Hipps*, 89 B.R. 264 (Bankr.N.D.Ga. 1988).

■ The final question to determine priority in this matter is whether the perfection occurred within 15 days after GC & G received possession of the equipment. Even though GC & G had possession and use of the equipment by virtue of the earlier five month short-term lease agreement, GC & G did not receive possession, as a debtor in the transaction at issue, until the documents were executed on October 16, 1998. In *Citizens Bank of Americus v. Federal Financial Services, Inc.*, 235 Ga.App. 482, 509 S.E.2d 339 (1998), the Georgia Court of Appeals adopted the "obligation" standard, as evidenced in a line of cases headed by *Brodie Hotel Supply, Inc. v. United States*, 431 F.2d 1316 (9th Cir. 1970). *Brodie*, applying the UCC definition of debtor as "the person who owes payment or other performance of the obligation secured," held that possession does not occur until the debtor is actually obligated by the terms of a contract, lease, or other obligation, to actually perform.

In *Citizens Bank*, the Georgia Court of Appeals found that possession of a logging skidder, which was originally delivered for demonstration purposes but purchased more than two months later, occurred, for purposes of O.C.G.A. § 11–9–312(4), on the date that the debtor paid for the skidder, even though that date was two months after the debtor acquired physical possession. The Court focused on the transition from bailee to debtor as the turning point of possession. Before the signing of the contract, the court stated that the "eventual purchaser received possession of the collateral on December 18 *for a specific purpose and thereby became its bailee.*" *Citizens Bank supra* at 484, 509 S.E.2d 339. When the debtor finally paid for the skidder, "the two factors (indebtedness for purchase price and possession) first coincided" and "[t]he lender had 15 days from that date to file the financing statement." *Id. See also Brodie Hotel Supply v. United States*, 431 F.2d 1316 (9th Cir.1970)(finding that the buyer of a restaurant who received equipment from seller before concluding negotiations as to the purchase price did not receive actual possession of equipment, for purposes of a purchase money security agreement, until the bill of sale arrived); *In re Hughes*, 230 B.R. 213 (Bkrtcy.M.D.Ga.1998)(finding that possession was received when debtor signed a security agreement and not when equipment was received); *In re Hooks*, 40 B.R. 715 (Bankr.M.D.Ga.1984)(finding that farmer who took physical possession of cows to determine if he wanted to purchase them did not gain actual possession of cows until he signed a security agreement and note with a credit association).

Coastal relies on the case of *Ivie & Associates, Inc.*, 84 B.R. 882 (Bankr. N.D.Ga.1988) for the proposition that the Debtor's earlier possession of the collateral for six months controls and the UCC financing statement was not filed for perfection within 15 days of the February lease. *Ivie*, however, is distinguishable because the particular lease in question was backdated to correspond to the original date that physical possession was delivered. Therefore, because physical possession occurred on the same day that the obligation was made effective, the Court held that recording outside the 15 day period of that date was ineffective. In the case at bar, the contract on which Case relies was not backdated to the point at which GC & G first took possession of the equipment.

Finally, Coastal attempts to distinguish *Citizens Bank of Americus* because it contends that, factually, GC & G was obligated as of February to execute the October lease agreement. I reject that contention because there was, as of February, no credit approval by Case of any lease on any terms. The credit Case eventually approved and funded differed materially from the terms anticipated in February and in no way can the October credit approval be construed to have created an obligation of GC & G which dated back to February. Thus, *Citizens Bank* is not distinguishable and, in fact, controls the outcome of the matter before me. *Compare*

*James Talcott, Inc. v. Associates Capital Company, Inc.*, 491 F.2d 879 (6th Cir.1974)(finding that the obligation was owed on the date that possession was received as required by back-dated lease agreements).

## CONCLUSION

Based on the foregoing analysis the security interest of Case Credit Corporation is deemed to be a purchase money security interest which was perfected within 15 days after the Debtor acquired possession of the collateral within the meaning of O.C.G.A. § 11–9–312. Thus, the Case security interest is entitled to priority over the pre-existing floating lien in equipment held by The Coastal Bank. There being no genuine issue of material fact, summary judgment is entered as a matter of law in favor of Case Credit Corporation and against The Coastal Bank and the other Defendants, none of whom responded to the Motion for Summary Judgment or contested the priority position held by Case vis-a-vis their interests.[1]

## EXHIBIT "A"—STIPULATIONS

The parties hereby enter into the following stipulations in the above adversary proceeding:

1. The equipment subject to competing security interests by The Coastal Bank ("Bank") and Case Credit Corporation ("Case Credit") in this adversary proceeding is identified as follows:

1 Caterpillar 563 Compactor (Serial No. 8XF00800)

1 Caterpillar 936E Wheel Loader (Serial No. 4SB02739)

1 Caterpillar D6H Bull Dozer (Serial No. 3ZF05981)

1 Caterpillar 12G Motor Grader (Serial No. 61M15264)

1 Caterpillar D4C Bull Dozer (Serial No. 7SL00100)

(collectively, the "Equipment").

2. At all times relevant to the issues presented in this adversary proceeding, John Douglas Galbreath ("JDG") was the President and sole shareholder of Galbreath Clearing & Grading, Inc. ("GC & G") and Galbreath Trucking Co., Inc. ("GTC").

3. Both GC & G and GTC were corporations duly organized and validly existing under the laws of the State of Georgia.

4. The Caterpillar 563 Compactor (Serial No. 8XF00800) and the Caterpillar 936E Wheel Loader (Serial No. 4SB02739) were purchased by GTC from Ring Power Corporation on or about March 10, 1994. The Compactor and the Wheel Loader were subsequently refinanced by GTC with Caterpillar Financial Services Corporation in January, 1996.

5. The Caterpillar 12G Motor Grader (Serial No. 61M15264) was purchased by GTC from Carlton Company in early August, 1994.

---

1. Caterpillar Financial Services Corporation, in answer to the Complaint, states that "it claims no interest in any of the items of equipment described in the Complaint and consents to entry of an Order by this Court directing the Clerk of the Superior Court of Chatham County, Georgia, to mark any uncanceled UCC–1 financing statements filed in the name of CFSC, Canceled." Douglas Asphalt Company, while responding to the Complaint asking for its dismissal and other relief that is "just and proper" and filing a motion to extend discovery, failed to respond to the motion for summary judgment. The United States of America, in its answer to the complaint on November 15, 1999 prayed for the Court to determine the validity, priority, and extent of the security interest that it held in the property at issue and filed and entry of appearance declaring Henry D. Dixon, Jr. and Lawrence B. Lee as counsel for the United States in this matter, but also failed to respond to the motion for summary judgment. James B. Wessinger, III, Chapter 7 Trustee appeared at a pre-trial conference on December 2, 1999, but made no further appearances and did not respond to this motion, and United States Trustee Jack Berry also failed to appear and respond.

6. There is no corporation formally organized under the name "Galbreath, Inc."

7. T & T and GC & G entered into a Retail Installment Sale Contract and Security Agreement (the "Agreement") dated October 16, 1998 regarding the Equipment.

8. T & T filed UCC–1 Financing Statement No. 015–98–667 with the Clerk of the Superior Court of Bryan County, Georgia, on October 26, 1998.

9. The UCC–1 Financing Statement described in paragraph 8 was filed within fifteen (15) days after the execution of the Retail Installment Sale Contract and Security Agreement (the "Contract") between GC & G, as Purchaser, and T & T, as Seller, dated October 16, 1998.

10. The Contract and the UCC–1 described in paragraph 8 were assigned by T & T to Case Credit.

11. GC & G executed a Promissory Note and Security Agreement in favor of the Bank in the amount of $404,041.00 dated August 3, 1994, and said note was subsequently renewed on various occasions.

12. The Bank filed UCC–1 Financing Statement No. 272153 with the Clerk of the Superior Court of Chatham County, Georgia on September 15, 1994.

13. A continuation statement was filed by the Bank on March 17, 1995 with regard to the UCC–1 described in paragraph 12.

14. GC & G executed a second Promissory Note and Security Agreement in favor of the Bank in the amount of $425,577.56 dated October 24, 1997, which was secured by the existing financing statement.

15. The description of collateral appearing on the Bank's UCC–1 Financing Statement includes all equipment of the Debtor "now or hereafter existing or acquired," and attached to the Bank's UCC–1 is a schedule of equipment.

16. None of the Equipment is listed on the schedule of equipment attached to the Bank's UCC–1 Financing Statement.

17. The Bank never had a security interest in any equipment owned by GTC, with the exception of a boat, motor and trailer.

18. Douglas Asphalt Company filed UCC Financing Statement No. 034–1998–2830 on November 20, 1998, in the Office of the Clerk of Superior Court of Coffee County, Georgia.

19. The United States of America filed a Notice of Tax Lien in the amount of $222,094.63, in the Offices of the Clerk of Superior Court of Bryan County and Chatham County, Georgia, which were recorded on November 19, 1998 and November 30, 1998, respectively. Any security interest related thereto is subordinate to the security interests held by the Bank and Case.